CASE 85.—PROSECUTION AGAINST ARTHUR WILSON FOR
RAPE.—Oct. 1, 1909.

## Wilson v. Commonwealth

Appeal from Christian Circuit Court.

THOMAS P. COOK, Circuit Judge.

Defendant convicted and appeals.—Reversed.

1. Criminal Law—Appeal—Review.—Cr. Code Prac. Sec. 281, pro-
viding that the decision of the court on a motion for a new
trial shall not be subject to exception, precludes the Court
of Appeals from reversing a criminal case on the evidence.

2. Criminal Law—Continuance—Grounds.—Where accused was
placed on trial 21 days after the finding of the indictment
charging rape, and the evidence justified the belief that pros-
ecutrix was mistaken in the belief that accused was the guilty
person, and accused was confined in jail from the time of the
finding of the indictment until the trial, and was unable by
reason of poverty and ignorance to prepare his case, it was
error to refuse a continuance on the ground of the illness of
his counsel.

3. Criminal Law—Appeal—Questions Reviewable.—Under the
Code, the ruling of the trial court on a motion for a new trial
on the ground of misconduct of individuals influencing the
jury while deliberating is not reviewable.

L. YONTS for appellant.

JAS. BREATHITT, Attorney General, and THOS. B. Mc-
GREGOR, Assistant Attorney General, for Commonwealth.

OPINION OF THE COURT BY JUDGE BARKER—Revers-
ing.

The appellant, Arthur Wilson, was indicted by the
grand jury of Christian county, charged with the of-
fense of rape committed upon the person of Mrs.

John T. Watson.  To this indictment he pleaded not guilty, but a trial by a petit jury resulted in his being found guilty as charged in the indictment and his punishment fixed at death.  Appellant's motion for a new trial having been overruled, he has appealed to this court for the purpose of having the judgment reviewed.  When the defendant was brought into court after the indictment was returned he announced that he had no attorney, whereupon the court appointed as counsel for him John Feland, who accepted the appointment and agreed to undertake the defense. The case was then set for the 23d day of March, just three weeks after the indictment was returned.  The appellant was a poor, and, apparently, friendless negro, who had been in jail during the whole of the time since his arrest.  When the case was called for trial on the 23d day of March, 1909, and after the commonwealth had announced ready for trial, the defendant announced not ready, and moved the court to continue the case on the ground that the attorney appointed for him by the court, John Feland, was sick in bed and unable to conduct the defense; that just before the trial the accused had ascertained this fact and had employed another lawyer, L. Yonts, to defend him; that Yonts was also sick and unable to take care of his interests at that time; that, by reason of these facts, he had been unable to prepare his case for trial, and was not ready to be tried; that he had a valid defense to the charge made against him, and verily believed if given sufficient opportunity to prepare his case he would be acquitted; that no other attorney save and except L. Yonts understood his case sufficiently to protect his interests, and that, he being sick and unable to defend the case properly, the accused felt and verily believed he could not have

a fair trial at this term of the court. Although none of the allegations of this affidavit were controverted in any way, the court overruled the motion for a continuance, and the trial resulted as heretofore stated.

The only ground presented by this record sufficient to authorize a reversal of the judgment is the ruling of the trial court in refusing the defendant a continuance in order that his counsel might be present and defend him. That the defendant, a negro, was charged with the crime of rape committed upon the body of a white woman, of itself placed him in great peril. The crime is one which in this state is regarded with such horror that the very charge of it always excites such passion in the community as to make it difficult for the accused to have a fair and impartial trial, or, at least, there is always danger that he will not have a fair and impartial trial. And it is obvious that under these circumstances it was of the utmost importance to the accused that he should be represented by counsel acquainted with his defense and in full health and strength and vigor to present it to the jury. The defendant, as said before, had been in jail continuously. We think we are warranted in presuming that he was densely ignorant, and that the terrors of his surroundings were such as to paralyze the feeble mental faculties he possessed. That the officers in charge of him believed there was danger of his being mobbed if confined in the Hopkinsville jail is shown by the fact that he was sent to Henderson, some 50 miles away, for safe-keeping there. So far as this record shows, there was no adequate preparation made for the defense of the accused, and, if all the evidence introduced for the commonwealth be true (assuming the possibility of mistake on the part of the prose-

cuting witness in her identification of him), he could not have been guilty of the offense with which he was charged. In order to make this apparent, we will recite the salient facts as showns by the bill of exceptions.

John T. Watson and his wife, the prosecuting witness, on the 11th day of January, 1909, left Hopkinsville and drove some 20 miles south over the Lindsey's mill road for the purpose of collecting weekly payments due on sewing machines from the purchasers. About 4 o'clock in the afternoon they stopped at the cabin of a negro man, Buck Moss, for the purpose of making a collection from him. It was very cold and sleeting, and they went into the negro's house to warm by the fire, and stayed until after dark before leaving. They there met Arthur Wilson, and had some talk with him in regard to selling him a sewing machine. When they got ready to start, it being dark, they borrowed a lantern from Moss. The accused, Arthur Wilson, asked and was permitted to ride with them in their buggy to a roadside grocery at Pee Dee, where they stopped at Joe Ledford's saloon. They went into this saloon, and the husband bought a pint of whisky, and he and his wife drank some of the contents straight. Arthur Wilson also bought a pint of whisky, which he from time to time drank. All the parties left the saloon and drove southwardly. When they reached the bridge which crosses Little River at Lindsey's mill, the horse fell on the sleet, and the defendant, Arthur Wilson, helped to get it up, going to a roadside cabin and obtaining the assistance of two other negroes for this purpose. The husband and wife then drove on, leaving Wilson and the other two negroes together on the roadside. They drove some 300 yards further,

crossed the bridge, where the horse again slipped and fell upon the ice, this time breaking the harness, and freeing itself entirely from the vehicle. John T. Watson got out of the buggy and caught the horse, which had gone some thirty or forty yards from the buggy. On the far side of the bridge and by the roadside, there was a store kept by William Dawson; this being about 300 yards from the place where the horse last fell. The husband called back to his wife, and told her he would have to go to Dawson's to get some strings to repair the harness, and also to borrow a lantern, and asked her if she was afraid to stay where she was until he came back. She answered "No," that she was not. Then the prosecuting witness stated as follows, as shown by the bill of exceptions:

"And while his voice was still ringing in her ears, and before he had reached a distance of forty yards from the buggy, the defendant came up to the side of the buggy, and took her by the arm and jerked her out of the buggy; that she told him he had better not bother her because her husband was not more than forty yards away, and the defendant told her that if she screamed he would kill her; that he told her to lay down, and that he fully accomplished his desire by having carnal knowledge of her person, and she was afraid to hollow; that at the same time he jerked her from the buggy he struck her on the side of the head; that she was certain her husband, John T. Watson, was not further away than forty yards at the time this occurred; that after the defendant accomplished his desire he ran away in the darkness. She said that the defendant did not hurt her except the blow on the side of the head, and to render her very nervous."

The husband testified in all respects substantially as did the wife, except that he said he was not gone over ten minutes, during which time his wife was ravished. We copy the following excerpt from the testimony of the husband:

"He was sure that he was not gone from his wife more than ten minutes. As he came up to the buggy he saw his wife standing by the side of the buggy, and also saw the defendant going from the direction of the buggy round on the opposite side, and his wife remarked to him that 'that negro' had ravished her. He said nothing to the defendant, but went to his wife and found her very nervous. He then harnessed his horse, and hitched him to the buggy, and turned around and went back to Dr. Caudle's."

As it was very dark, it is obvious that there was room for Mrs. Watson to be mistaken as to the identity of the negro who ravished her. Both she and her husband had been drinking, and the evidence shows that the husband was very much under the influence of what he had drunk.

The commonwealth then introduced William Dawson, whose testimony, as contained in the bill of exceptions, is so short that we copy it entirely, and it is as follows:

"That he was in his store until a late hour the night of January 11, 1909; that John T. Watson was at his store three times after dark that night; that the first time he came after some matches and went away, and in a few minutes defendant, Arthur Wilson, came into the store in a drunken condition, and sat down and went to sleep, and while he was there in that condition Watson came back and borrowed a lantern, and got some strings, but did not come inside the store; that, after Watson had been there the sec-

ond time, he (Dawson) put defendant, Arthur Wilson, out of the store and closed same up, and went into his residence.  In a short time Watson came to the gate and called to him, and asked him to come out, that his wife had been ravished.  He also heard a woman crying, and he refused to go out, and Watson told him he cared but little for the citizens of the country.  He also said that Watson seemed to have been drinking.  After he refused to go out, Watson drove away, and he did not hear any more that night.''

It will be observed that Dawson says that the accused, Arthur Wilson, came into his store in a drunken condition, sat down, and went to sleep, and was in this condition when Watson came to borrow strings to repair his harness; that Dawson loaned Watson a lantern and gave him strings to repair his harness, and he had left to go back to his wife.  Dawson then aroused Arthur Wilson from his drunken sleep, and put him out of his store. If what Dawson says is true, Wilson could not by any possibility have committed the crime with which he is charged, because the husband, John T. Watson, left him at Dawson's store and went directly back to his wife, and, after he was gone, Wilson was put out of Dawson's store by the proprietor.  Mrs. Watson says she was assaulted when her husband was on his way to Dawson's store, and not more than 40 yards from her.  At this time Wilson was in a drunken sleep at Dawson's store, if Dawson is to be believed.  As Dawson knew the accused and say him sitting in his store drunk, he could not be mistaken in his statements.  If his testimony is not true then he lied.  On the other hand, it seems to us that there is ample room for the belief that, if Mrs. Watson was ravished at all, she is mistaken in

the belief that it was done by Wilson. As said before, the darkness of the night, the suddenness of the attack, the trepidation of the victim, all lead to the conclusion that it was possible for her to be mistaken in the identity of her assailant. On the other hand, Dawson, whose credibility is indorsed by the commonwealth, could by no possibility be mistaken in his identification of Wilson as being the drunken man who was put out of his store after Jno. T. Watson left with the lantern and strings. Of course, under section 281 of the Criminal Code of Practice, it is not within our province to reverse this case upon the insufficiency of the evidence, or because the verdict was flagrantly against the weight of the evidence. We have discussed it with a view of showing the great importance to the accused of having his case intelligently prepared and his defense vigorously presented. This could not be done by a lawyer who was sick. No preparation—at least, no adequate preparation—was made to defend the accused. His poverty, his ignorance, his confinement in jail, and the terrors necessarily engendered by the awfulness of the charge made against him preclude the idea that he could do anything in the preparation of his case on his own behalf. He was necessarily dependent upon his lawyer, and that he did not receive adequate assistance of counsel in this case is apparent from the most casual inspection of the record. Only 21 days intervened between the finding of the indictment and the time he was put upon trial for his life without the aid of counsel to defend him. We think he was entitled to a continuance, and that it was the duty of the court to see to it, if he was unable to employ an attorney, that he was furnished with able counsel in order that his defense, if any he had, might be fully

presented to the jury sworn to try him for his life.

There is evidence in the record to show other irregularities in the procedure, and that strong pressure was brought to bear upon the jury to inflict the death penalty in this case. Affidavits of disinterested parties show that several men while the jury were in charge of the sheriff spoke to them, calling the defendant a vile name, and telling the jury to hang him; that while the jury were in their room considering the case men stood out in the street and attracted their attention, and then made signs by drawing their hands across their throats and dropping their heads over their shoulders, thereby indicating that the defendant should have his neck broken. This we can not under the Code consider on appeal; those facts as constituting grounds for a new trial being left exclusively within the jurisdiction of the trial court. We mention them here, as we discussed the evidence, with a view of illustrating the grave importance to the accused to have a strong, vigorous attorney in charge of his case, rather than one who is so indisposed as to be unable to attend to his duties. The law should be ever watchful of the interest of the accused who is poor and friendless. There is no time when the shadow of its protecting aegis should fall upon him more certainly than when public clamor calls for a victim, and, if it fails him then, it falls justly within the sneer of the dramatist who long ago said:

"* * * * Plate sin with gold,
And the strong lance of justice hurtless breaks;
Arm it in rags, a pigmy's straw does pierce it."

Judgment reversed for a new trial consistent with the principles herein announced.