Sherill D. HARSTON, Appellant,

v.

**COMMONWEALTH of Kentucky, Appellee.**

Supreme Court of Kentucky.

Aug. 31, 1982.

Rehearing Denied Oct. 12, 1982.

Jack Emory Farley, Public Advocate, William M. Radigan, Asst. Public Advocate, Frankfort, for appellant.

Steven L. Beshear, Atty. Gen., Virgil W. Webb, III, Asst. Atty. Gen., Frankfort, for appellee.

STEPHENSON, Justice.

Sherill D. Harston was charged with capital murder but was convicted of murder, KRS 507.020, manslaughter in the first degree, KRS 507.030, and theft by unlawful taking, KRS 514.030. He was sentenced to a term of ninety-nine years for murder, twenty years for manslaughter and five years for theft by unlawful taking. It was adjudged that the sentences be served consecutively.

Harston lived in a trailer park with Diane Marcum and her three-year-old son, Anthony. The body of Diane Marcum was discovered on January 4, 1979. A detective investigated and recovered articles that had belonged to Diane Marcum which Harston had sold to others in the trailer park. Harston was apprehended in Indianapolis, Indiana, with Diane Marcum's automobile. On the trip back to Kentucky, Harston, after

being advised of his constitutional rights, related a story in which he blamed a drug dealer for the killings. He stated that after being threatened he remained in the area for several days and sold the victim's property.

On January 11, 1979, the body of Anthony Marcum was recovered. On that day Harston was questioned and after being informed of his rights confessed to the killings and signed a confession which was read to the jury.

Harston stated that when he returned home on December 28, 1978, after an evening of drinking, he had an argument with Diane Marcum, that he choked her to death and then passed out. He stated that the next morning when he awoke Anthony was crying for his mother. He then proceeded to drown Anthony. Harston then transported the bodies to a remote location, burned them and threw them into a river. He then returned to the trailer and sold all of their property, clothing, furniture, etc.

Among the assertions of error, Harston argues that he was not competent to stand trial. In January 1979, soon after arrest, Harston was committed in order to evaluate his competency to stand trial. He was then evaluated at another psychiatry unit for a period of two months and was evaluated by other psychiatrists later on.

At a competency hearing on October 8, 1979, the psychiatrist testified with evaluations ranging from paranoid schizophrenia to "faking" and "malingering."

Another hearing was held on December 21, 1979, with contradictory testimony as to the competency of Harston. At a final hearing on December 28, 1979, lay witnesses, prisoners in jail with Harston, testified as to normal behavior, as did police officers and the jailer.

On January 4, 1980, the trial court entered an order finding Harston competent to stand trial. We have examined the record and there is substantial evidence to support the finding of the trial court. The testimony of one of the doctors was accepted by the trial court and this is sufficient.

*Edmonds v. Commonwealth,* Ky., 586 S.W.2d 24 (1979). Harston argues the weight of the expert evidence. This misses the point. The finding is supported by substantial evidence and as such will not be disturbed.

At a pretrial conference Harston proffered additional testimony as to his competency to stand trial. The trial court refused to reopen the issue and the avowal of the doctor stated that he had utilized various tests to eliminate the possibility that Harston was faking his condition and that lay persons could not detect any problems since schizophrenia is a thought disorder and not a behavior disorder.

On the day the trial commenced Harston sought again to reopen the issue by requesting a continuance and proffering the testimony of one of the doctors who had conducted an updated examination of Harston. Harston's counsel stated the doctor would testify that Harston was not faking and as to the ability of lay persons to detect schizophrenia. The doctor had previously testified to these points.

For these two occasions Harston argues the applicability of RCr 8.06. The rule has the salutatory provision that if at any stage of the proceeding the trial court has a doubt as to competency, there is an obligation to make an inquiry. This rule does not place upon the trial court a duty to hold hearing after hearing in the absence of some appearance of change in the defendant's condition since the ruling on competency. Ordinarily the application of RCr 8.06 would involve some behavior on the part of the defendant which would indicate incompetency to the trial court. Necessarily the trial court has discretion in this respect, and there is no right to a continual succession of competency hearings in the absence of some new factor. There was no abuse of discretion here on the part of the trial court in denying further testimony on the issue already ruled upon.

Harston defended on the ground of insanity and the medical and lay proof at trial was essentially the same as that at the

various hearings on competency to stand trial.

■ Harston makes extensive arguments with regard to the competency issue and the insanity issue. All the arguments assume incompetency and insanity. It would appear elementary to us that where the ruling is based on substantial evidence there is no error. There is an abundance of evidence in the record to support the ruling that Harston was competent to stand trial and that he was not insane at the time of the homicide. We did, however, review all the testimony with regard to Harston's mental condition.

During the course of his testimony, one of the doctors mentioned that psychiatry is an inexact science. After reviewing the medical testimony, we conclude this is an understatement. Two psychiatrists testifying for the prosecution found that Harston was not insane but was faking. The two psychiatrists and the two psychologists who testified for the defense stated that Harston was a schizophrenic, paranoid type, was in their opinion insane at the time of the homicides and had been insane since adolescence. We can imagine that in situations such as presented here the fact finder is in a terrible position. If psychiatry deserves the label of science, we cannot see how there can be such a wide divergence of opinion. One possible explanation is that the concept of legal insanity and medical insanity with regard to the language of KRS 504.020 is a factor. The language of the statute which excuses criminal conduct is "if . . . as a result of mental disease or defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." This is a standard vague in scope and pretty well open to the interpretation desired by the one determining the issue. For the jury particularly getting a grasp on the medical testimony by applying this standard could in other instances be a frustrating task. We have faced similar situations in workmen compensation cases, such as *Blankenship v. Lloyd Blankenship Coal Co.*, Ky., 463 S.W.2d 62 (1971), where

there is the problem confronting the fact finder of one skilled physician seeing silicosis in an x-ray and the other physician testifying that no evidence of silicosis is present. Determining what goes on in the recesses of another's mind certainly would appear to be more difficult.

The following is a thumbnail sketch of the testimony on the issue of insanity.

The principal psychiatric witness of the prosecution was a Dr. Green. He saw Harston in jail on the same day the child was murdered. Harston had been arrested for driving while intoxicated and was seen by the doctor for the alcohol problem. He testified Harston's thought processes were clear, he was coherent with no symptoms of schizophrenia; that two weeks later Harston was well oriented, alert, and denied any delusions. He was seen on three other formal meetings with the same observations, in addition to many times at the jail to see if anything unusual was happening. Then in October 1979, Harston at a meeting in jail seemed hostile, stated he was the son of Satan. Later that month Harston was very hostile and would not talk. About a week later in early November as the doctor approached the cell he could hear Harston playing a guitar and singing to the other inmates. Upon seeing the doctor, Harston put down the guitar and would not say anything. Two other visits that month were made with Harston unwilling to talk.

Dr. Green then testified he instituted a procedure of observations by non-medical personnel. "How is the man behaving when he is out of eyesight of the so-called pros?" He used a check list and followed on a day-to-day basis, using other inmates, jailers and law enforcement people. He testified that "without exception everybody said" . . . "when the psychologist leaves," . . . Harston "was a different person, he's talking, conversing, friendly, playing cards, reading the newspaper, listening to the T.V., and as soon as" a doctor appears, he either acts crazy or "won't talk at all." Many of these laymen were used by the prosecution as witnesses of Harston's behavior at the jail.

Dr. Green expressed the opinion Harston was faking. He opined that a psychotic person cannot be completely normal, that he may be able to pull himself together for a few minutes and look pretty good, but not for long. He stated that Harston was not psychotic but was just a sort of mean, temperamental unpredictable kind of person.

Another psychiatrist of the prosecution testified that Harston was faking the son of Satan story, that he was not schizophrenic, but had a long-standing personality disorder.

Witnesses for the defense related interviews with Harston and hearing the son of Satan story. Psychological tests were performed and Harston's history of being in mental hospitals was given as one basis of finding him not sane at time of crimes and testimony that he had been insane since adolescence. One psychiatrist testified it was doubtful Harston was faking, another that it was possible. We are advised that schizophrenias are withdrawn, keeping away from others; that they can be deceptive; that being uncooperative is a symptom; as to recollection, remembering too well is a symptom of schizophrenia; that schizophrenic does not mean one automatically fails the criminal test of responsibility; that Harston has periods when he is in remission; and that one percent of the population is schizophrenic, the condition being transmitted through the genes.

While recognizing that psychiatry cannot be an exact science, there should be a more easily understood and simple standard for determining legal insanity.

The next argument by Harston is that the case should be reversed for the reason that a stipulation that photographs of the victims should not be used was breached by the prosecution and the photographs were used in the penalty phase of the trial. Strangely enough Harston does not argue any prejudice by use of the photographs. Also we cannot see any. Surely the verbal description of this grisly murder of a child weeping over the body of his mother could not be further aggravated by the display of photographs.

During a pretrial conference Harston's lawyers suggested an agreement to stipulate cause of death of the victims etc., and that the photographs not be used. The commonwealth attorney agreed as to the guilt phase of the trial, but stated he would use the photographs in the penalty phase. The stipulation recites the photographs were not to be introduced as *evidence.* We are not disposed to unravel this argument. Since the death penalty was not imposed, it would be difficult to argue that the jury was inflamed at the sight of the photographs. Harston argues the stipulation saved the prosecution a great deal of time and this is sufficient reason to reverse. We are of the opinion no unfair prejudice was shown in any event and find it unnecessary to decide the meaning of the stipulation.

Lastly Harston argues that our fifty-page limitation on briefs violates his right to effective assistance of counsel. We can only say that the purpose of briefs is to persuade this court to the appellant's position. We do have other cases to consider and suggest that quantity is no substitute for quality.

The other arguments of error do not merit discussion.

The judgment is affirmed.

All concur.