James D. HUNTER, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 91–SC–430–MR.

Supreme Court of Kentucky.

Jan. 31, 1994.

Marie Allison, Margaret F. Case, Asst. Public Advocate, Dept. of Public Advocacy, Frankfort, for appellant.

Chris Gorman, Atty. Gen., Ian G. Sonego, Asst. Atty. Gen., Criminal Appellate Div., Frankfort, for appellee.

STEPHENS, Chief Justice.

This is a direct appeal from the judgment of the Clark Circuit Court which sentenced appellant, James D. Hunter, to death following a conviction of murder. He also received a life sentence for his conviction on the charge of arson in the first degree.

### FACTS

In the early morning hours of June 25, 1990, Debbie Sue Stratton Hunter burned to death in a fire that began in the bedroom of her home. Three days later appellant, her husband of approximately five weeks, was arrested and charged with capital murder and arson. The Commonwealth's case against appellant consisted of strong circumstantial evidence. Consistent with his story of awakening to fire and running through it to get out of the house, appellant suffered second and third degree burns on his legs and feet. However, expert testimony at trial indicated that the placement of some of the burns, the absence of burns on the *bottom* of appellant's feet, as well as the lack of any upper body burns, singed hair, and/or respiratory damage was consistent with neither appellant's version of events nor the conclusions that arson investigators reached about the intensity and course of the fire after analyzing physical evidence at the scene.

In addition, appellant was unable to explain how his burned blue jeans, which tested positive for the same "weathered gasoline" found at the crime scene, were found in a trash can at a nearby laundromat. There was also undisputed testimony that appellant's car was seen going in the direction of the victim's home about 2:30 or 2:45 a.m. on June 25, shortly before the witnesses heard sirens and saw the smoke and light from the fire. The fire was reported at 3:05 a.m. Finally, there was evidence of the couple's turbulent relationship, accounts of infidelities, the victim's plans to seek an annulment, and a volatile argument the night of the fire.

### ASSIGNMENTS OF ERROR

In this appeal appellant raises twenty-six assignments of error. The majority of this Court has concluded that the error which has occurred with reference to two issues, so substantially and prejudicially violates appellant's right to a fair trial, that the verdict and judgment must be reversed and the case remanded for a new trial. The first issue is the trial court's denial of defense motions for continuances, resulting in insufficient time for appellant to be examined thoroughly by a mental health expert. This violation of due process deprived appellant of the opportunity to explore fully (a) present competency, (b) possible guilt phase defenses, (c) penalty phase mitigation evidence, and/or (d) possible exemption from the death penalty because of mental retardation. The second ground for reversal is the trial court's refusal to instruct the sentencing jury to consider as a mitigating factor, "evidence of extreme emotional disturbance not sufficient to constitute a defense," under KRS 532.025(2)(b)(2). Because we deem it necessary to reverse this case on these two issues, which will be fully discussed below, we decline to address the remaining allegations of error.

### I. WHETHER THE TRIAL COURT'S DENIAL OF DEFENSE MOTIONS FOR CONTINUANCES CONSTITUTED REVERSIBLE ERROR.

It is quite settled that whether to grant a motion for continuance is well within the sound discretion of the trial court. *Morris v. Slappy*, 461 U.S. 1, 11–12, 103 S.Ct. 1610, 1616–17, 75 L.Ed.2d 610 (1983), *Crawford v. Commonwealth*, Ky., 824 S.W.2d 847,

850–1 (1992). Thus, a trial court's ruling on a continuance motion will remain undisturbed unless it appears to the appellate court that, in overruling the motion, there was a clear abuse of judicial discretion such as to deny the accused substantial justice. *Brashear v. Commonwealth*, Ky., 328 S.W.2d 418, 419 (1959), *Williams v. Commonwealth*, Ky., 644 S.W.2d 335, 336 (1982). "Under some circumstances, however, the facts may be so plain and demanding that a denial of a continuance will be deemed an abuse of discretion ..." and will require reversal. 17 Am. Jur.2d, Continuance § 37 citing *Wilson v. Commonwealth*, 134 Ky. 669, 121 S.W. 614 (1909). We believe that the facts of the present case in light of the factors set forth in *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) and *Snodgrass v. Commonwealth*, Ky., 814 S.W.2d 579, 581 (1991), compel this Court to reverse.

## A. Facts Supporting Motions For Continuance.

On September 6, 1990, the nineteen year old appellant was arraigned on charges of capital murder and first degree arson. A trial date was scheduled for November 5, 1990. On October 9, defense counsel filed a motion for a Kentucky Correctional Psychiatric Center (hereinafter, KCPC) competency evaluation, and two days later, his first motion for a continuance. A formal order granting both motions and continuing appellant's trial date until January 7, 1991 was entered into the record on November 2, 1990.

On December 7, the Commonwealth filed the required thirty days notice that it intended to seek the death penalty. By December 27, less than two weeks before trial, the results of the court-ordered competency evaluation had still not been completed. The trial judge granted defense counsel a second continuance. In the same motion, counsel requested the court to order that the KCPC evaluation include information as to the availability of any defenses or mitigating factors based upon defendant's mental health. On January 10, 1991, the trial court ordered additional evaluation and rescheduled the trial for March 11, 1991.

On December 14, 1990, the KCPC examining psychologist, Dr. Donald Beal, Ph.D., spent three hours evaluating appellant to determine his competency to stand trial. Thus far the court had ordered evaluation with respect to only this question. After the trial court's order of January 10, Dr. Beal spent an additional thirty minutes with appellant, for the purpose of determining the availability of mental health-related defenses and/or mitigating factors.

The first and final KCPC report regarding appellant's criminal responsibility was not filed until February 27, 1991. The report concluded that appellant was competent to stand trial, and was sane at the time of the offense. It did not, however, address either the issue of possible guilt phase defenses or the issue of any mitigating factors that might indicate the impropriety of the death penalty in this case.

While the report was silent as to possible defenses or mitigating factors, the author of the report was not. The court-ordered psychologist contacted defense counsel to report his view that appellant might have some form of extreme emotional disturbance defense. He explained to counsel that he was unable to pursue this possibility in his evaluation because of "[appellant's] vagueness during the clinical interview and ... a tendency to carefully censor his responses to this examiner." It was his opinion that appellant's unwillingness to cooperate was due to his own admonition to appellant (at the start of the interview) that whatever appellant said to him would *not* be confidential and could be used against him at trial.

This set of circumstances, one week before trial, prompted defense counsel again to move for a continuance based on appellant's mental condition. At a non-evidentiary hearing on March 4, 1991, counsel elaborated to the trial court the basis of his request: (1) that for seven months he had personally observed the steady deterioration in appellant's mental and emotional state, to the extent that counsel seriously doubted appellant's ability to assist in his own defense or to testify in his own behalf; (2) that even the court-ordered psychologist, Dr. Beal, had expressed discomfort with his inability to as-

sess completely appellant's mental condition. Beyond the questions of competency and sanity, Dr. Beal felt that there may be "some problems" that he was not able to reach and explore because appellant was not forthcoming; and (3) that for the above reasons, counsel had been trying for weeks to locate a private psychiatrist to evaluate appellant,[1] and had finally secured the services of Dr. David Shraberg who was scheduled to evaluate appellant the very next day.

The trial judge overruled appellant's motion. He stated that counsel's observations of "depression, apprehension, or lethargy" were not enough to give grounds for a continuance. Indeed, appearing to dismiss any need for further evaluation of appellant's mental state with respect to possible defenses or mitigating factors, the court stated that the *only* further evidence it would consider would be testimony that appellant was, in fact, at that time, incompetent to stand trial.

Appellant was tried as scheduled and found guilty on Friday, March 15, 1991. Beginning at this point, there were three further requests for continuances, each citing the critical need for time so that appellant might be examined by Dr. Shraberg.[2] Immediately after the jury's finding of guilt, defense counsel moved to postpone commencement of the penalty phase, which was to begin the next working day. The motion was denied. On March 18th, the penalty phase began with a motion for a *twenty-four hour* continuance, as Dr. Shraberg was immediately available to examine appellant, and could possibly give testimony as to his mental state the following day. Again the motion was denied. Appellant was sentenced to death later that day.

Finally, on April 11, the day of formal sentencing by the Court, defense counsel informed the judge that appellant, in the interim, had been examined by Dr. Shraberg. As grounds for his final request for a continuance, counsel referred to a preliminary report by the psychiatrist that recognized in appellant "more severe signs of a [mental] illness than a mere personality disorder," including a recommendation that a "secondary diagnosis of probable borderline personality with paranoid and dependent features should be entertained." Perhaps even more noteworthy was the doctor's initial judgment that appellant's "I.Q. is most likely in the low 70's." The significance of this information, of course, is due to the fact that an I.Q. of seventy is the lower threshold at which a defendant becomes "death ineligible" under KRS 532.130(2) and KRS 532.140(1).

## B. The Trial Court's Refusal to Grant a Continuance Constituted an Abuse of Discretion Under Both Federal and State Law.

### 1. Federal Law

The trial court's denial of defense counsel's requests for time amounted to reversible error under federal due process standards. In *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the U.S. Supreme Court framed its discussion of a defendant's right to the assistance of a psychiatrist in terms of "meaningful access to justice." *Id.* at 77, 105 S.Ct. at 1093. In *Ake,* the issue was whether 14th Amendment Due Process requires the state to provide an indigent defendant with a psychiatrist to assist in building an effective defense. In the present case, the issue is whether, under these facts, due process requires a trial court to provide appellant with the *time* to be properly and completely examined.

The *Ake* court began with the proposition that when a defendant's mental state is

"seriously in question, ... the state must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in *evaluation, preparation,* and *presentation of a defense.*"

*Id.* at 82–83, 105 S.Ct. at 1096. (emphasis added). Next the Court set out three factors

---

1. Evidence in the record establishes that defense counsel contacted over twenty psychiatrists in the time between his conversation with Dr. Beal and March 4, before asking the court to continue the trial.

2. Dr. Shraberg had cancelled the March 5, 1993 appointment.

to be balanced in determining under what conditions this "safeguard" is mandated by due process. The first two factors require consideration of the private interest and the governmental interest, respectively, that will be affected if this safeguard is provided by the State. The third factor involves an assessment of the probable procedural value of providing a psychiatrist along with the risk of an erroneous deprivation, if psychiatric assistance is not provided. *Id.* at 76, 105 S.Ct. at 1093.

■ In applying these factors to the case before us, it is clear that the trial court incorrectly refused to grant appellant a continuance, and thus, the opportunity to be examined by Dr. Shraberg. As stated by the Court in *Ake*, "The private interest in the accuracy of a criminal proceeding that places an individual's liberty or life at risk is almost uniquely compelling." *Id.* In this capital case, appellant's stake in the outcome cannot be overstated, and must weigh heavily in our analysis.

We next consider the interest of the government in denying appellant the time necessary to be examined by a defense psychiatrist. In *Ake*, the State of Oklahoma argued that a rule requiring psychiatric assistance be made available to indigent defendants would result in a staggering financial burden to the State. *Id.* at 78, 105 S.Ct. at 1094. The Court rejected this economic interest as insubstantial, when compared to the interest of both the State and the individual in obtaining information that leads to a more accurate disposition of the case.

Here, although not explicit from the trial record, there exists an undercurrent in the State's arguments, advancing an interest in dispatching this case for the sake of judicial economy. The State also, in its brief hinted at an interest in forestalling "routine claims" by defendants which are merely tactics designed to delay prosecution. As for judicial economy, the Court rejected the notion that

a colorable request for time to inquire into matters that are tantamount to the "basic tools of an adequate defense," *Britt v. North Carolina*, 404 U.S. 226, 227, 92 S.Ct. 431, 433, 30 L.Ed.2d 400 (1971), should ever be subordinated to the State's desire for trial expediency, especially in a capital case. Further, the court believed there was enough evidence before the trial court to preclude any conclusion that appellant's need for information regarding his mental condition was anything but a legitimate requirement for the preparation of an adequate defense. It was concluded that the government interest in a "speedy trial" under these circumstances is not appreciable.

Finally, the Court in *Ake* inquired into the probable value of the psychiatric assistance sought and the risk of error if such assistance is denied. Such an inquiry must necessarily recognize "the pivotal role that psychiatry has come to play in criminal proceedings." *Ake*, 470 U.S. at 79, 105 S.Ct. at 1094. By making a defendant's mental condition relevant not only to criminal culpability, but also to the degree and kind of punishment conviction will bring to bear, the State itself has instituted a framework in which psychiatric assistance may turn out to be an essential ingredient of justice. The existence of federal law,[3] many state statutes,[4] as well as state court decisions[5] that all provide indigent defendants with this type of assistance speaks to the truth of this observation. In the context of the present case, this Court can find no principled means for distinguishing between providing "financial access" to a psychiatrist (as due process required in *Ake* ) and providing the practical access to a psychiatrist that appellant was seeking here by asking the trial judge for a reasonable amount of time.

In weighing the third factor, it is important to recognize that a defendant's mental condition is simply not at issue in every case. In those instances, of course, the probable

---

**3.** Criminal Justice Act, 18 U.S.C. § 3006A(e).

**4.** See, e.g., Ala.Code 15–12–21 (Supp.1984); Fla. Rule Crim.Proc. 3.216; Ky.Rev.Stat. 31.070, 31.-110, 31.185 (1980); Ohio, Rev.Code Ann. 2941.51 (Supp.1983).

**5.** See, e.g., *State v. Clemons,* 168 Conn. 395, 363 A.2d 33 (1975); *Commonwealth v. Gelormo,* 327 Pa.Super. 219, 227, 475 A.2d 765, 768 (1984); *People v. Worthy,* 109 Cal.App.3d 514, 167 Cal. Rptr. 402 (1980).

value of such assistance will not be significant. This is an issue for a trial court to weigh in light of the evidence before it. In this case, just as in *Hayden v. Commonwealth*, Ky., 563 S.W.2d 720, 722 (1978), the trial attorney expressed doubt concerning his client's competence to stand trial based upon his interviews and conferences with him. In *Hayden* the attorney's observations were sufficient to trigger RCr 8.06, which mandates an evidentiary hearing concerning a defendant's present competence to stand trial. *Id.* at 722.

Similarly, the fact that the KCPC report failed to address possible defenses or mitigating factors provided the trial court with adequate grounds to grant a continuance. A defendant has a constitutional right to have considered by the sentencer, *as a mitigating factor,* "any aspect of [his] character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Because of the incomplete evaluation, this appellant lacked the necessary information to exercise his constitutional right.

Finally, there is evidence that appellant exhibited somewhat bizarre behavior at trial. It is in the record that both the trial judge and the prosecutor, at different times in the proceeding, interrupted themselves to comment to appellant about his strange behavior and inappropriate laughter. This Court has stated that RCr 8.06 "has the salutary provision that if at any stage of the proceedings the trial court has a doubt as to competency, there is an obligation to make an inquiry." *Harston v. Commonwealth,* Ky., 638 S.W.2d 700, 701 (1982).

As for the second prong of the third factor, the "risk of error" analysis involves two considerations. The risk of error in any case is intimately connected to the defendant's need for psychiatric assistance in the first place. Clearly, as the probable value of psychiatric assistance to an accurate jury determination increases, so does the actual risk of error in its absence. Also, because of the complex nature and the finality of the consequences of a capital trial, not only is the range of issues

on which error can be had greater, but naturally the result of error is more serious as well.

Based on these three factors, there is little doubt that under the federal due process principles set forth in *Ake,* appellant was entitled to a continuance to seek further psychiatric evaluation.

### 2. State Law

■ The trial judge's refusal to grant appellant's motions to continue the trial date is independently contrary to Kentucky law. In *Snodgrass v. Commonwealth,* Ky., 814 S.W.2d 579 (1991), where the defendant sought a continuance for the purpose of employing new counsel, this Court set forth the factors a trial court should consider in the exercise of its discretion to grant or deny a continuance: "length of delay; previous continuances; inconvenience to the litigants, witnesses, counsel and the court; whether the delay is purposeful or is caused by the accused; availability of other competent counsel; complexity of the case; and whether denying the continuance will lead to identifiable prejudice." *Id.* at 581. Applying these factors to the present case, a majority of this Court concludes that, under Kentucky standards, there was a clear abuse of judicial discretion.

1. *Length of delay.* The motions for continuances on appellant's behalf ranged from a request for "one day" to a request for several weeks. The circumstances prompting defense counsel's motions leave little doubt that he was simply trying, in good faith, to obtain sufficient time for a thorough psychiatric evaluation of his client, under conditions not perceived by appellant to be adversarial. In light of the lack of confidentiality that the KCPC psychologist afforded appellant, the length of delay counsel was seeking cannot be viewed as unreasonable.

2. *Previous continuances.* This capital trial took place in just over six months time, from arraignment to the jury's recommendation of the death sentence. There were only two continuances granted. Each was necessary because the KCPC evaluation had either not taken place or been reported to the

court. While there is certainly no prescribed length of time in which a capital trial should take place in order to ensure fairness, a trial court has the authority[6] as well as the duty to proceed in a manner that allows for reasonable development and presentation of relevant evidence.

In *Snodgrass,* where this Court upheld the lower court's denial of a continuance, the facts present a different scenario. In that case, the defendant was refused additional time on the morning of trial, after there had already been four continuances in a sexual abuse trial that did not begin until one year after the defendant was arraigned.

3. *Inconvenience to the litigants.* In opposing appellant's motions for a continuance, the State never alleged that further delay would cause inconvenience to itself or any of its witnesses. In contrast, the Assistant Commonwealth's Attorney in *Snodgrass* vehemently objected to the continuance motion on the grounds that "[w]e have a room full of witnesses and have everybody subpoenaed in." *Id.* at 580.

4. *Whether the delay was purposeful or caused by the accused.* As previously stated, the trial court granted two continuances when it became clear the KCPC mental health evaluation report would not be available on the original or rescheduled dates for trial.[7] The remaining requests for time were based on valid trial preparation needs of defense counsel. Unlike the defendant in *Snodgrass,* in no way can appellant be said to have contrived the need for delay.

Defense counsel had bona fide doubts about his client's present competency. He further had ample reason to believe that additional examination of appellant would contribute to his ability to build a defense based on extreme emotional disturbance, or at least offer the same in mitigation of the death penalty. Even if ultimately unsuccessful, appellant was entitled to the time and opportunity for his attorney to explore these avenues of defense.

5. *Availability of other competent counsel.* This factor is not applicable to this case.

6. *Complexity of the case.* This is a capital case. The fact that its resolution may eventually lead to appellant's execution renders the need for a complete, accurate evaluation of his mental health thoroughly compelling. There are multiple purposes that such an evaluation could potentially serve: an indication of appellant's competency at the time of trial (in light of the possibility of new information); the possibility of available guilt phase defenses; knowledge of factors that could have been offered in mitigation of punishment by death; whether appellant could be deemed to be ineligible for the death penalty with respect to his I.Q.;[8] and insight into whether the appellant is, in fact, mentally ill, a suspicion which seems to have been confirmed since trial.[9]

6. *Identifiable prejudice.* Each of the above issues was raised by counsel at the trial level and could have foreseeably affected the outcome of either phase of the trial. While this Court operates with the benefit of hindsight, the same was not required in order to discern either the need for more information or the potential prejudice to appellant of an inaccurate result because of its lack.

## II. WHETHER THE TRIAL COURT'S PENALTY PHASE INSTRUCTIONS WERE ERRONEOUS.

 Appellant contends that the trial court's failure to provide the jury with an instruction to consider extreme mental or

---

6. RCr 7.24(3)(B)(i).

7. November 5, 1990 and January 7, 1991.

8. *See* infra note 9(2).

9. As grounds for a motion for a competency evaluation filed with this Court on July 27, 1992, appellate counsel offered, in part, the following information: (1) appellant has consistently responded to counsel's questions concerning his case with totally incoherent statements, most having nothing whatever to do with his trial or appeal; (2) the Department of Corrections has measured appellant's verbal I.Q. at sixty-nine; and (3) on June 14, 1992, the prison reported that appellant was suffering from severe hallucinations (involving "seeing snakes coming out of his eyes" and having weapons lodged in his stomach,) after which he was hospitalized, placed on anti-psychotic drugs and a fifteen-minute suicide watch.

emotional disturbance as a mitigating factor violated his constitutional right to individualized sentencing and due process under Amendments 8 and 14 of the United States Constitution and Sections 2, 11, and 17 of the Kentucky Constitution. We agree.

KRS 532.025(2)(b)(2), in pertinent part, reads:

(2) In all cases of offenses for which the death penalty may be authorized, the judge shall consider, or he *shall* include in his instructions to the jury for it to consider, any mitigating circumstances ... otherwise authorized by law and any of the following statutory ... mitigating circumstances *which may be supported by the evidence:*

(b) mitigating circumstances:

(2) The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance even though the influence of extreme mental or emotional disturbance is not sufficient to constitute a defense to the crime; (emphasis added).

Because the statute is stated in mandatory terms and includes the language, "any mitigating factor ... which *may* be supported by the evidence," a majority of this Court believes that based on the proof, such an instruction was required to be tendered. (emphasis added).

While we agree with the trial judge that the evidence did not warrant a guilt-phase instruction on extreme mental or emotional disturbance under KRS 507.020(1)(a), the quantum of evidence necessary to sustain a penalty phase instruction is clearly less. The principle underlying this part of the legislature's sentencing scheme is that "punishment should be directly related to the personal culpability of the criminal defendant." *Smith v. Commonwealth,* Ky., 845 S.W.2d 534 (1993). With respect to the concept of mitigation, this imperative reflects "the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Id.* at 538. (quoting *California v.*

*Brown,* 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987) (concurring opinion).

In *Smith,* this Court found error in the trial court's denial of a penalty phase instruction on the same statutory mitigating factor. The proof in *Smith* consisted of testimony by witnesses that the defendant was a twenty-nine year old man who had suffered a series of personal tragedies, including three divorces and the death of his son. Despondent and intoxicated, he sought out the victim for consolation only to be "spurned" and rejected numerous times. The majority concluded that these circumstances support a mitigating instruction as to extreme emotional disturbance. *Id.* at 539.

The proof in appellant's case is even stronger. At the time of the crime, appellant was a nineteen year old man of limited mental capabilities, married to the victim who was thirty-three years of age. Testimony at trial portrayed a disturbed young man involved in a five-week marriage that suffered from numerous separations and regular infidelities on the victim's part. The general description of the marriage was corroborated by entries in the victim's personal diary.

The record also reflects that appellant and his wife fought constantly, including on the evening of the fire over her accusations that appellant had broken her kitchen door. Additionally, there was evidence that appellant knew his wife had gone camping with another man the weekend of the fire and was also with a man at her house the evening of the fire. When compared with the proof offered on behalf of the defendant in *Smith,* we have no difficulty in finding that under these facts, the standard set forth in the statute is met. There existed more than sufficient grounds in support of an instruction to the jury on the statutory mitigating factor of extreme mental or emotional disturbance.

## III. CONCLUSION

There is no doubt that the crime appellant committed was a heinous one. However, as the foregoing demonstrates, errors occurred in this capital case that severely prejudiced appellant and violated his constitutional rights. The trial court's denial of appellant's motions for continuances foreclosed any op-

portunity for appellant to gain demonstrably necessary information about his mental health. Therefore, under the unique facts of this case, the trial judge's refusal to grant appellant time amounted to an abuse of judicial discretion. Appellant was also entitled, under KRS 532.025(2)(B)(2), to have the judge instruct the jury to consider the mitigating circumstance of extreme emotional disturbance in determining whether appellant should be sentenced to death. The statute employs mandatory language and sets a standard which the evidence in this case easily meets.

For these reasons, this verdict must be reversed and the case remanded to the trial court for further proceedings consistent with this Opinion.

LAMBERT, LEIBSON and STUMBO, JJ., concur.

WINTERSHEIMER, J., dissents in a separate dissenting opinion.

REYNOLDS and SPAIN, JJ., join this dissent.

WINTERSHEIMER, Justice, dissenting.

I respectfully dissent from the majority opinion because the trial judge did not abuse his discretion in denying a continuance regarding the services of mental health professionals and because the penalty phase instructions did not amount to reversible error.

Several continuances requested by the defense were granted while some last minute requests were denied. Defense counsel requested additional time to prepare an examination to assist them in the sentencing phase. It was only after the verdict that counsel for Hunter suggested that the earlier requested evaluation was to show incompetency. The trial judge did not abuse his discretion in overruling the requested delay under the specific facts of this case as presented at that time by the defense. KCPC had evaluated Hunter and determined that he was competent to stand trial. Another defense doctor reported that he could not say that Hunter was incompetent. Nothing in this record indicates that the trial court was on notice with sufficient information to require a competency hearing. Dr. Beal found that "there was no compelling evidence that James Hunter was suffering from a thought or mood disorder or from mental retardation at the time of the psychological evaluation."

The motions presented to the trial judge did not indicate that evaluations by Dr. Shraberg, who had agreed to give a second opinion as to the defendant's mental condition at this time, were necessary to prepare Hunter's defense at trial or to prepare a defense of mental illness or mental retardation or mitigating factors regarding Hunter's mental condition. The trial judge indicated he would consider other evidence and was willing to reconsider the question of postponing the trial after Dr. Shraberg had evaluated Hunter.

It would appear that the trial judge may have misconstrued the basis for Hunter's motion for a continuance or his need for the second evaluation as pertaining to competency rather than defense and mitigation. Such a misunderstanding might have been the result of the representations made by defense counsel as to the purpose of the exam or reasons for seeking delay. Dr. Shraberg's report on his post-trial evaluation of Hunter does not indicate that the defendant was incompetent to stand trial and states that he appears to understand the nature of the charges and the consequences of the various sentences.

The jury instructions given during the penalty phase were correct. During the guilt phase, Hunter's defense was denial of the crime. He now argues on appeal that he was entitled to an instruction on extreme emotional disturbance as a mitigating factor during the penalty phase. *Smith v. Commonwealth*, Ky., 737 S.W.2d 683, 686 (1987), observes that there must be evidence to support the inference that the defendant was unable to control his actions in carrying out a homicide. As has been noted by this Court in *Foster v. Commonwealth*, Ky., 827 S.W.2d 670 (1992), a planned deliberate homicide is the antithesis of extreme emotional disturbance. K.R.S. 532.025(2)(b)(2) provides for an instruction on mitigating circumstances which may be supported by the evidence. The evidence here indicates that Hunter was

the only witness to his relationship or state of feelings regarding his deceased wife at the time of the fire. Although there was marital discord, there is no positive evidence that Hunter was still angry at his wife when he went to her house on the day of the fire. The evidence is that there were two substantial trails of gasoline from the bedroom to the kitchen and on to the back porch. The evidence indicates that the victim was asleep at the time the fire was set. In view of the fact that the trail of gasoline went into and included the bedroom, the individual who laid the trail of gasoline and set the fire could hardly fail to know that the victim was asleep in the bedroom. This is strong evidence of an intentionally set fire, rather than a fire set on emotional impulse.

Under all the circumstances, I do not believe there was reversible error in refusing to grant an additional continuance in order to obtain a second psychiatric opinion and that the failure to give an instruction on extreme emotional disturbance at the penalty phase was not reversible error.

Hunter received a fundamentally fair trial. I would affirm the conviction and sentence.

REYNOLDS and SPAIN, JJ., join in this dissent.