Fred FURNISH, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 1999–SC–0676–MR.

Supreme Court of Kentucky.

Nov. 21, 2002.

As Modified Dec. 10, 2002.

Rehearing Denied Feb. 20, 2003.

Randall L. Wheeler, Thomas M. Ransdell, Department of Public Advocacy, Frankfort, for Appellant.

A.B. Chandler III, Attorney General, Louis F. Mathias, Jr., Michael G. Wilson, Office of the Attorney General, Assistant Attorney General, Frankfort, for Appellee.

Opinion of the Court by Justice GRAVES.

Appellant, Fred Furnish, was convicted in the Kenton Circuit Court of murder and was sentenced to death. In addition, Appellant received enhanced sentences of thirty years for first-degree burglary, life imprisonment for first-degree robbery, ten years for theft by unlawful taking over $300, and ten years for obtaining money by fraud, by virtue of his being found to be a first-degree persistent felony offender. He appeals to this Court as a matter of right.

On the afternoon of Thursday June 25, 1998, 66–year–old Jean Williamson was discovered dead in her home. Williamson's body was found in a kneeling position, leaning over the bathtub, in the master bathroom. Williamson was fully clothed and blood was found in the master bedroom, indicating that her body had been moved into the bathroom after death. An autopsy revealed the cause of death to be strangulation, and a washcloth is believed to have been the murder weapon. A search of the crime scene revealed no forced entry and no identifiable fingerprints. Williamson's bedroom, as well as the bedroom of her daughter, Gail, were ransacked and jewelry and credit cards were stolen. On August 14, 1998, Appellant was indicted in the Kenton Circuit Court for murder, first-degree robbery, burglary, receiving goods and services by fraud, theft by unlawful taking, and for being a first-degree persistent felony offender.

At trial, defense counsel conceded that Appellant was a "thief and a burglar," and that he had been in the Williamson residence on the day of the murder, but denied that Appellant murdered Williamson. It was the defense theory that Appellant and another person had intended to burglarize the Williamson residence but that this other "mystery person" is the one who murdered Williamson.

The Commonwealth introduced evidence that Appellant, who was employed by Kiwi Carpet Cleaners, had been in the Williamson residence on May 19th, approximately one month before the murder. In fact, the indictment for theft by unlawful taking over $300 related to jewelry that Appellant stole from the Williamson residence while he was there cleaning the carpets on May 19th. In addition, on the day of the murder, several neighbors observed a man, later identified as Appellant, walking near the Williamson residence. Police recovered Williamson's jewelry from numerous acquaintances of Appellant. Further, video surveillance tapes from several area banks depicted Appellant using Williamson's ATM card to obtain cash in the hours following her death.

On appeal, Appellant raises numerous allegations of error, many of which are unpreserved. For convenience, we have categorized these issues into five sections. To the extent that any error is unpreserved, it has been reviewed in accordance with the standard set forth in *Cosby v. Commonwealth*, Ky., 776 S.W.2d 367 (1989), *cert. denied*, 493 U.S. 1063, 110 S.Ct. 880, 107 L.Ed.2d 963 (1989), *overruled, in part, St. Clair v. Roark*, Ky., 10 S.W.3d 482 (1999), i.e., whether there was a reasonable justification or explanation for defense counsel's failure to object, and whether the totality of the circumstances is persuasive either that the defendant would not have been found guilty of a capital offense or that he would not have received the death sentence but for the unpreserved error. *See also Tamme v. Commonwealth*, Ky., 973 S.W.2d 13 (1998), *cert. denied*, 525 U.S. 1153, 119 S.Ct. 1056, 143 L.Ed.2d 61 (1999).

After reviewing the record and hearing oral argument, we affirm Appellant's convictions. However, because Appellant was erroneously denied an instruction on life without the benefit of probation or parole, we remand this matter to the Kenton Circuit Court for a new penalty phase in accordance with this opinion. As such, we need not address those issues pertaining to the penalty phase which are not likely to reoccur on remand.

## I. PRETRIAL ISSUES

### 1. *Indictment*

■ Appellant argues that the grand jury indictment was defective because it failed to state the culpable *mens rea* for the charges of murder, receiving goods and services by fraud, and theft by unlawful taking over $300. We have repeatedly held that an indictment is sufficient if it fairly informs the defendant of the nature of the crime with which he is charged. *Stephenson v. Commonwealth*, Ky., 982 S.W.2d 200 (1998); *Thomas v. Commonwealth*, Ky., 931 S.W.2d 446 (1996); *Wylie v. Commonwealth*, Ky., 556 S.W.2d 1 (1977). At his arraignment, Appellant stated that he understood the charges contained in the indictment. At no point did Appellant allege that notice was insufficient. Reversal is not warranted on this issue.

■ Appellant also contends that because the Grand Jury failed to include aggravating circumstances in the murder indictment the prosecution was precluded from seeking the death penalty. We disagree. The indictment, which was returned on August 14, 1998, clearly charged Appellant with "Murder, a capital offense, when he caused the death of Jean Williamson, by strangling her to death, in violation of KRS 507.020 ...." Moreover, on the same date that the indictment was returned, the Commonwealth filed a formal "Notice of Aggravating Circumstances," which stated that the case would be prosecuted as a capital case based on the aggravating circumstances of the murder being committed while Appellant was engaged in the commission of first-degree robbery and first-degree burglary. At no time prior to this appeal did defense counsel complain of insufficient notice and Appellant may not claim such at this time.

### 2. *Denial of Continuance*

■ Appellant argues that he was prejudiced by the trial court's refusal to grant a 35-day continuance. Appellant alleges that the trial court was more concerned with judicial economy and Appellant's trial interfering with other matters on the docket than with ensuring that Appellant received "meaningful access to justice." Appellant contends that this denial of a continuance violated his right to both federal and state due process standards by failing to provide him with the opportunity for complete evaluation, preparation, and presentation of a defense. *Hunter v. Commonwealth*, Ky., 869 S.W.2d 719, 722–24 (1994); *see also Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). The trial court's extensive order demonstrates that this issue lacks merit.

Appellant was indicted on August 24, 1998, and the trial court initially scheduled a trial date of January 26, 1999. In December, defense counsel moved to continue the trial until June 1999, to allow more time for preparation. Following a hearing, the trial court granted a continuance until April 13, 1999. Throughout numerous pretrial hearings, counsel was reminded that the April trial date was "firm."

On March 31, 1999, a hearing was held concerning the Commonwealth's intent to introduce KRE 404(b) evidence. At the close of the hearing, the Court afforded

the parties an opportunity to file supplemental authority prior to 2:00 p.m. on April 1st. This extension of time was a result of defense counsel's assertion that certain materials needed to be presented *ex parte* to avoid revealing confidential defense matters to the Commonwealth. The record indicates that after defense counsel failed to file any additional materials, counsel's office was called and the trial court was informed that the defense had decided not to file any supplemental pleadings.

However, on April 5th, the defense filed a "Supplemental Affidavit in Support of Motion to Continue." The affidavit did not relate to any confidential matters as previously represented by defense counsel, but rather reasserted counsel's "bald assertions" that the defense had been too busy to prepare for trial and needed additional time.

On April 7, 1999, the trial court entered an 18–page order detailing the procedural history of the case and extensively addressing the continuance issue. The Court noted that although 35 days was, facially, a minimal extension, it believed defense counsel was aware that the request was not realistic, in that on the day counsel sought to have the trial begin, eight other jury matters were scheduled, most of which involved representation by defense counsel's own office; that the courthouse was scheduled to move in June; that another death penalty case scheduled for September 1999 would likely delay the trial in this case until late Fall 1999 or Winter 2000; and that, in fact, if Appellant's trial was scheduled during the same quarterly jury panel as the other death penalty case, defense counsel would object if one panel was utilized for two death penalty proceedings. Thus, the trial court ruled the inconvenience to the litigants, witnesses, counsel and the court was significant.

Furthermore, the trial court acknowledged that although there had only been one prior continuance, a ten-month period to prepare a death penalty case was sufficient and additional continuances should not have been necessary. The trial court opined that perhaps the public defender's office was not engaging in an efficient use of time.

The trial court further stated that the record was devoid of any evidence indicating the delay was caused by Appellant himself and noted that Appellant was represented by three competent attorneys. Consequently, the trial court concluded that defense counsel's request for additional time to conduct independent testing of fingerprint evidence and to retain additional expert witnesses weighed in favor of granting a continuance to avoid any prejudice to Appellant. Accordingly, the trial court granted a 14–day continuance.

■ *Snodgrass v. Commonwealth*, Ky., 814 S.W.2d 579 (1991), sets forth the seven factors to be considered by the trial court in ruling upon a motion for continuance: (1) length of delay sought; (2) previous continuances; (3) inconvenience to litigants, witnesses, counsel, and the court; (4) whether the delay is purposeful or is caused by the accused; (5) availability of other competent counsel, if at issue; (6) complexity of the case; and (7) whether denying the continuance would lead to identifiable prejudice. As noted above, the trial court considered each factor.

■ The trial court's order clearly reveals that it exhaustively analyzed the circumstances presented and determined that defense counsel's request was "more for the appellate record" and contained primarily bald assertions that counsel needed more time. Even at this point in time,

Appellant is unable to set forth anything specific that would have been done had he received the 35–day continuance. *See Foley v. Commonwealth,* Ky., 953 S.W.2d 924, 937 (1997), *cert. denied,* 523 U.S. 1053, 118 S.Ct. 1375, 140 L.Ed.2d 522 (1998). The trial court has broad discretion in granting or denying a motion for continuance, and that discretion was not abused in this case. RCr 9.04.

### 3. *Conflict of Interest*

█ In a related issue, Appellant alleges that the trial court's April 7th order denying his request for a 35–day continuance created serious conflict of interest questions between Appellant and defense counsel.

In a diatribe on Kentucky's Code of Professional Responsibility, Appellant claims that the trial court implied defense counsel was not providing adequate representation. After receiving the order, defense counsel filed a motion to withdraw on the grounds that such was mandated KRPC 1.16(a), since a conflict of interest existed between counsel and Appellant. On appeal, Appellant now opines that he was entitled to some form of remedial relief. Essentially, Appellant argues that the trial court should have recused itself from a hearing to determine whether its order did, in fact, create a conflict and, if so, what remedial action was required. We find this argument to border on frivolous.

While the trial court, in its April 7th order, opined that defense counsel was aware that a 35–day continuance was unrealistic and was requested more for the benefit of the appellate record, the trial court further stated, "Defendant has three skilled, experienced and competent lawyers who are vigorous in their representation of him." At no time did the trial court accuse defense counsel of "violations of the ethical duties of representation" as is alleged in Appellant's brief. Furthermore, we are of the opinion that although the trial court should have refrained from expounding on its perceived deficiencies of the public defender system, such comments certainly did not rise to the level of creating a conflict of interest between defense counsel and Appellant, nor did they warrant recusal.

### 4. *Judicial Bias*

Appellant argues that the trial judge should have recused prior to the sentencing hearing because he had already decided to sentence Appellant to death. Appellant's argument is based upon the following statement by the court:

> With the verdict, it's my understanding by statute or rule with the—with the sentence that's been recommended by the jury, the Court must do a written report to the Supreme Court, in addition to the formal sentencing document. So, I need a PSI to complete that report, because there's a lot of information that goes in there that's not been presented in this trial.

Appellant contends that the above language indicates that the trial court did not consider any additional information and merely "rubber stamped" the jury's recommendation of death. As this case is being remanded for a new penalty phase, we need not address this issue other than to conclude that we do not find any indication that the trial court was biased against Appellant.

## II. JUROR ISSUES

### 1. *Limitations on Voir Dire*

█ Appellant argues that he was denied the opportunity to voir dire potential jurors on the full range of penalties. Specifically, defense counsel sought to elicit

from potential jurors whether they could impose a minimum sentence of twenty years for murder. At a bench conference, the trial court stated:

> [Y]ou can identify clearly, ... the four possible range of penalties, term of years imprisonment not less than 20, term of life in prison, term of life in prison without parole for at least 25 years, and death. Clearly can be identified, "Can you consider the full range of penalties?" As a follow-up question, as Mr. Spicer was attempting to do yesterday, I will not allow, "Can you consider 20 years?" I will allow, "Can you consider a penalty of 20 years to the most severe penalty of death?" Because that encompasses the full range of penalties. Twenty years is not an option, by itself. That option is ... not less than 20 years. Which means 20 years to life.
>
> ...
>
> And I want to make it clear for the record, there is not an option, as a fifth alternative, to pick 20 years. That misleads the jury. There is an option to pick a term of not less than 20 years, or 20 years to life. Acknowledging that under the instructions of the court, based upon the proof and the facts of this case, the jury very well could retire to the jury room, and if they find Mr. Furnish guilty, sentence him to 20 years. But that will be a choice of 20 years to life, that will not be a fifth option of 20 years only.

Counsel is entitled to question jurors on whether they "could consider the entire range of penalties in the event a guilty verdict was returned." *Anderson v. Commonwealth*, Ky., 864 S.W.2d 909, 911 (1993); *see also Springer v. Commonwealth*, Ky., 998 S.W.2d 439 (1999). Contrary to Appellant's assertion, this case is not analogous to *Fugate v. Commonwealth*, Ky., 993 S.W.2d 931, 938 (1999), wherein the trial court "directed the defendant to mention only the terms 'minimum and maximum' without mentioning any specific number of years." Here, defense counsel was not impeded from inquiring whether potential jurors could consider the full range of penalties, including a term of not less than twenty years. No error occurred.

Appellant also claims prejudicial error because he was not permitted to question the panel on drug addiction as a mitigating circumstance and the presumption of innocence, as well as what he perceives as an incorrect definition of "substantial." Suffice it to say, we have reviewed these claims and have determined that the trial court properly curtailed questions that were not proper and only confused the panel.

The remainder of Appellant's complaints concern his belief that the prosecutor was given a greater preference and latitude during voir dire questioning. The record refutes such a claim. The extent of direct questioning by counsel during voir dire is a matter within the discretion of the trial court. *Grooms v. Commonwealth*, Ky., 756 S.W.2d 131, 134 (1988). The trial court correctly limited defense counsel's questioning when it became clear that jurors found the inquiry confusing. Both parties were able to thoroughly voir dire the panel and the trial court stated that it looked to the "totality of the answers" in ruling on the challenges for cause.

## 2. *Excusals for Cause*

The decision whether to excuse a juror for cause is a matter within the sound discretion of the trial court. If the trial court abuses its discretion by improperly failing to sustain a challenge for cause, it is reversible error because the defendant had to use a peremptory chal-

lenge and was thereby deprived of its use otherwise. *Thomas v. Commonwealth,* Ky., 864 S.W.2d 252, 259 (1993), *cert. denied,* 510 U.S. 1177, 114 S.Ct. 1218, 127 L.Ed.2d 564 (1994). While it is unnecessary to discuss Appellant's arguments relating to those jurors he believes should have been excused due to their inability to consider the full range of penalties, he also alleges that several jurors should have been excused due to their connection to the charged crimes or exposure to publicity.

■ Juror Griffith was an employee of PNC Bank, although at a different branch than the one where Appellant used Williamson's ATM card. Juror Griffith commented that she was familiar with the type of video system used at PNC banks and that she had on occasion been responsible for changing the videotape at her branch. Griffith also stated that she was acquainted with the Commonwealth's witness, Fred Mattress, a PNC Bank employee who testified regarding the bank's video camera system. However, Griffith noted that she worked at a different branch than Mattress and had not heard any details of the case. Griffith stated that she could base her decision on the evidence she heard in the courtroom.

Although defense counsel did not move to excuse Juror Griffith, Appellant now argues that the trial court should have *sua sponte* removed her for cause. We disagree. We do not find Juror Griffith's knowledge of the video system particularly relevant since there was no issue raised that the cameras that captured Appellant using Williamson's ATM card were malfunctioning or somehow inaccurate. Further, neither Juror Griffith's acquaintance with Mattress nor her employment with PNC warranted her excusal for cause. *Compare Marsch v. Commonwealth,* Ky., 743 S.W.2d 830 (1987). Juror Griffith

clearly expressed that she would consider only the law and facts of the case in making her decision.

■ Jurors Brosmore and Hofacre were likewise not required to be excused for cause after stating they were aware of publicity following the crimes. "The fact that a prospective juror may have some knowledge of a case does not establish objective bias." *Foley, supra,* at 932. In *McQueen v. Scroggy,* 99 F.3d 1302, 1319–20 (6th Cir.1997), *cert. denied sub nom, McQueen v. Parker,* 520 U.S. 1257, 117 S.Ct. 2422, 138 L.Ed.2d 185 (1997), the Sixth Circuit Court of Appeals stated:

> There is no per se rule that mere exposure to media reports about a case merits exclusion of a juror. To the contrary, in order to merit disqualification of a juror, the media reports must engender a predisposition or bias that cannot be put aside, requiring the juror to decide a case one way or the other . . . . There is no constitutional prohibition against jurors simply knowing the parties involved or having knowledge of the case. The Constitution does not require ignorant or uninformed jurors; it requires impartial jurors. While it may be sound trial strategy for an attorney to exclude anyone with knowledge of the facts or the parties, such a result is not mandated by the Constitution.

All of the challenged jurors in this case stated that they could be impartial and base a decision on the facts and evidence presented. Disqualification was not warranted.

3. *Peremptory Challenges*

■ Appellant's argument that the trial court's allocation of peremptory strikes was erroneous is without merit. RCr 9.40(2) provides that if alternate jurors are to be seated, the number of challenges for

"each side and each defendant shall be increased by one." Contrary to Appellant's interpretation, in a case where there is only one defendant, such as is present here, the defense "side" and the "defendant" are one and the same. *Springer v. Commonwealth, supra,* at 444. The trial court properly ruled that Appellant was entitled to one, not two, additional peremptory strikes.

Nor are we persuaded by Appellant's proposition that defendants should be given additional peremptory strikes to "offset the [prosecution's] tremendous advantage of knowing more about panel members and being an elected official trying a case with jurors selected from the registered voters list." While certainly novel, this notion is utterly without any basis in our case law or criminal rules on the grounds asserted. The decision whether to grant additional peremptories is within the discretion of the trial court and will not be disturbed absent an abuse of that discretion. *Bowling v. Commonwealth,* Ky., 942 S.W.2d 293, 308 (1997), *cert. denied,* 522 U.S. 986, 118 S.Ct. 451, 139 L.Ed.2d 387 (1997).

## III. EVIDENTIARY ISSUES

### 1. *Purchase and Use of Crack Cocaine*

Prior to trial, the Commonwealth filed a notice pursuant to KRE 404(c) of its intent to introduce evidence pertaining to Appellant's purchase and use of crack cocaine during the evening of June 25, 1998, and the morning of June 26, 1998. The Commonwealth stated that evidence of Appellant's purchase of drugs with money obtained through the use of Williamson's stolen ATM card demonstrated motive and was "interwoven with other evidence essential to the case in that the separation of this evidence cannot be accomplished without serious adverse effect to Plaintiff."

Over defense objection, the trial court ultimately ruled that while evidence of Appellant's cocaine use prior to the offenses was not admissible, evidence of Appellant's actions "surrounding his commission of the offense of receiving goods and services obtained by fraud on June 25–26" was intertwined with facts of the other crimes and that the probative value outweighed any prejudicial effect. We agree.

Appellant contends that the evidence of his crack cocaine purchase and use was not relevant because defense counsel admitted that Appellant had committed all of the crimes except murder. Notwithstanding, the trial court properly held that the evidence was inextricably intertwined so as to be admissible under KRE 404(b). Appellant is not entitled to stipulate away otherwise competent evidence simply because he does not want the jury to hear such. *Barnett v. Commonwealth,* Ky., 979 S.W.2d 98 (1998); *Chumbler v. Commonwealth,* Ky., 905 S.W.2d 488 (1995). The evidence of Appellant's use of crack cocaine showed that he used Williamson's ATM card to obtain money to purchase the drugs. Clearly, such evidence is intertwined with the evidence pertaining to the other charges in this case. *Cf Funk v. Commonwealth,* Ky., 842 S.W.2d 476 (1992). No error occurred.

### 2. *Prior theft*

Pursuant to KRE 404(b), the Commonwealth introduced the testimony of Betty Geiman, who testified that Appellant had cleaned her carpets on April 17, 1998, while he was employed with Kiwi Carpet Cleaning. On June 12, 1998, Appellant returned to Geiman's home on a bicycle and requested to inspect her carpets. Geiman testified that she was unaware Appellant was no longer employed by Kiwi and allowed him to enter her home when she noticed that his bike had a

flat tire. After looking at the carpets, Geiman left Appellant alone in the kitchen to make several phone calls to ostensibly get help with his bicycle. At some point after Appellant left, Geiman went to retrieve her purse from the kitchen and realized that her wallet was missing. On cross-examination, Geiman conceded that she did not actually see Appellant take her wallet nor had she used her wallet for two days prior to realizing it was missing.

Defense counsel did not object to Geiman's testimony and Appellant concedes that this issue is not preserved. However, in cases in which the death penalty has been imposed, a two part inquiry is made to determine whether there is a reasonable justification or explanation for counsel's failure to object, and, if there is no reasonable explanation, whether the unpreserved error was prejudicial. *Sanders v. Commonwealth*, Ky., 801 S.W.2d 665, 668 (1990), *cert. denied*, 502 U.S. 831, 112 S.Ct. 107, 116 L.Ed.2d 76 (1991) (*citing Cosby, supra*).

We are of the opinion that it was reasonable trial strategy not to object to Geiman's testimony because it supported defense counsel's opening proposition that while Appellant was a thief, he was not a murderer. Geiman was not injured in any manner nor was she physically threatened by Appellant. The allegation was that he simply stole he wallet. As such, we do not believe her testimony was prejudicial to Appellant. Reversal is not warranted.

### 3. *Comment on pre-arrest silence*

On June 28, 1998, a search warrant was obtained for the residence of Dawn Godsey, Appellant's cousin, where Appellant had been staying. Appellant was present when officers arrived and he was handcuffed for the protection of the officers. Appellant was specifically told he was not under arrest. Appellant was taken to a Kenton County Police Department conference room pending execution of the warrants. While there, he told various officers "I don't know what you're talking about" and "I got nothing else to say" when asked about Williamson's murder.

At trial, Detective Denham repeated Appellant's statements, as did the prosecutor during closing arguments. Appellant contends that as a result, he was denied his constitutional right to remain silent and that his statements were not admissible since he was not Mirandized prior to making them. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

We need not engage in a lengthy constitutional analysis of whether Appellant was or was not in custody and whether his *Miranda* rights were, in fact, violated. A review of Appellant's statements lead us to the inescapable conclusion that he did not remain silent, but rather denied any knowledge of the crimes. At no point did Appellant state that he did not wish to talk to the officers or that he desired questioning to cease until he could speak with an attorney. Appellant quite simply denied his involvement. As such, we fail to see how Appellant's constitutional rights were violated by Officer Denham's testimony.

### 4. *Criminal History*

The Commonwealth introduced testimony of three police officers concerning their previous interactions with Appellant. Police Chief Fred Anderson testified about his general familiarity with Appellant. Detective Embry stated that he had obtained a photograph of Appellant for identification purposes from the Hamilton County Detention Center. Finally Detective Wallace testified that during a search of Dawn Godsey's home, where Appellant was known to frequently stay, he discovered a Halloween mask and a pistol in the refrigerator. Again, Appellant concedes

48

that no objection was raised to the testimony of the officers.

Appellant contends that the officers' testimony was violative of KRE 404 in that it served no other purpose than to imply that he had a criminal history and to show character in conformity therewith. We disagree.

Nothing in the officers' testimony suggested that their prior contacts with Appellant were criminal in nature. Chief Anderson simply stated that he had known Appellant from "probably in the early to mid 80's" and that he was "generally familiar with him." Anderson's association with Appellant could have occurred in a multitude of situations. Nor do we find Detective Embry's testimony about the photograph of Appellant reversible error. At no point did Detective Embry inform the jury that it was a mug shot or comment on Appellant's charges in Hamilton County. Finally, we fail to perceive the prejudice of Wallace's reference to the pistol and Halloween mask. Possession of either, in and of itself, is not a bad act or evidence of a crime. Furthermore, even Detective Wallace stated that while finding the items in the refrigerator was "out of the ordinary," they "really meant nothing to this case."

We conclude that counsel made a strategic decision not to object and possibly create the inference that Appellant had a problematic history with police. Notwithstanding, we find that Appellant was not prejudiced by the evidence and the outcome of the trial would not have been different in its absence.

5. *Evidence Pertaining to Use of Gloves*

 The Commonwealth theorized that Appellant wore surgical gloves during the commission of the crimes, thus accounting for the lack of fingerprints police found in the Williamson residence. In fact, police recovered a box of surgical gloves from Dawn Godsey's residence. The day before trial, defense counsel learned that some types of surgical gloves are lubricated with cornstarch and that the Commonwealth had conducted testing on a box of gloves similar to those found in Godsey's residence. The Commonwealth sought to introduce a photograph of the gloves found in Godsey's residence, a laboratory report indicating that cornstarch was found in Williamson's car and on her wallet, and photographs of Williamson's car depicting the white smears. Thereafter, the defense moved to exclude any evidence relating to cornstarch.

Due to the lateness of the Commonwealth's tests, the trial court ruled that the report was inadmissible, and that the prosecution was prohibited from presenting expert testimony concerning the use of cornstarch to lubricate surgical gloves. However, the court ruled that the photograph of the gloves and the photograph of Williamson's car depicting the white residue were admissible. Appellant thereafter moved to exclude the photographs on the grounds that no testing had been conducted on the actual gloves found in Godsey's residence, and that no other evidence connected those particular gloves to the crime scene. The motion was denied. At trial, Detective Rolfson testified that he processed the crime scene for fingerprints but found none that were identifiable. He further informed the jury that he found a "white substance" smeared on the console of Williamson's car and on her wallet.

Appellant argues that photographs were improperly admitted because there was no evidence that he wore gloves during the commission of the crimes and further, there was no evidence that the gloves found in Godsey's residence had any connection to the crime scene. We find no error.

The prosecution's theory was that the absence of any identifiable fingerprints was reasonably attributed to the use of gloves. Appellant had access to such gloves and, in fact, residue found in Williamson's car and on her wallet was similar to that found on surgical gloves. Certainly, the testimony of Detective Rolfson along with the fact that Appellant had access to surgical gloves was relevant circumstantial evidence. Although the Commonwealth was properly precluded from making any reference to cornstarch, the jury could still infer that the lack of fingerprints and the presence of a white substance smeared on areas at the crime scene indicated the use of gloves during commission of the crimes.

 Nor do we find the prosecutor's reference to the gloves during closing arguments erroneous. During closing argument a prosecutor may draw reasonable inferences and propound his explanation of the evidence and why it supports a finding of guilt. *Tamme, supra* at 39.

6. *Alleged Exculpatory Evidence*

 On May 11, 1999, two weeks into Appellant's trial, while defense counsel was reviewing notes that Detective Rolfson had used during his testimony, counsel discovered an e-mail that was first sent to police on July 5, 1998. The e-mail, sent by an individual named Art McNeil, stated that McNeil had heard another person "called Dewey" had provided Appellant transportation to the Williamson's house on June 25th and had possibly participated in the crimes. Defense counsel immediately moved for a continuance, as well as for exclusion of the death penalty as a sanction for the nondisclosure by the Commonwealth. The trial court granted the continuance but denied the motion for sanctions.

Later the same day, a further hearing revealed that a Dewey Jump had been previously interviewed by police and had an alibi. In fact, Jump was the boyfriend of Dawn Godsey. Godsey testified that she and Jump had gone to Warsaw, Kentucky on Wednesday, June 24th, and had not returned until 4:30–5:00 p.m. the following day, after the crimes had been committed. The Commonwealth defended that the McNeil e-mail was not exculpatory evidence but merely rumor and speculation. The Commonwealth noted that all statements from Jump and Godsey had previously been provided to the defense. There is some allegation that defense counsel was already aware of the e-mail as well, however nothing in the record supports such a conclusion.

The following day, defense counsel informed the trial court that they had investigated the matter and that additional time was unnecessary. The trial thereafter continued.

We cannot agree with Appellant that the information contained in the e-mail was exculpatory or that he was prejudiced by the Commonwealth's alleged failure to disclose such. Godsey was a defense witness and defense counsel had the opportunity to thoroughly question her about Jump's alibi. Furthermore, no steps were even taken to discover who Art McNeil was, and whether his information was credible. In the absence of any supporting evidence, the e-mail was nothing more than unsubstantiated rumor. The trial court granted Appellant's request for a continuance and we conclude that no further relief was warranted.

7. *Humanization of Victim*

 There was no error in permitting Ed Strohmeier, a close friend of Williamson, to testify about their growing relationship, Williamson's love for her

children and grandchildren, and about her hobbies and charity work.

A murder victim can be identified as more than a naked statistic, and statements identifying the victims as individual human beings with personalties and activities does not unduly prejudice the defendant or inflame the jury. Just as the jury visually observed the appellant in the courtroom, the jury may receive an adequate word description of the victim as long as the victim is not glorified or enlarged.

*Bowling, supra,* at 302–303; *see also Hodge v. Commonwealth,* Ky., 17 S.W.3d 824, 847 (2000), *cert. denied,* 531 U.S. 1018, 121 S.Ct. 581, 148 L.Ed.2d 498 (2000). The evidence was not unduly prejudicial.

## IV. INSTRUCTIONS

1. *Life Without the Benefit of Probation or Parole*

■ On August 14, 1998, Appellant was indicted for conduct which occurred in May and June of 1998. In July 1998, the provisions of HB 455 took effect, authorizing, in part, a sentence of life without the benefit of probation or parole (LWOP) in capital cases. Prior to trial, Appellant moved the trial court to apply the provisions of HB 455. The trial court ruled that the decision whether to apply the new sentencing provisions contained in HB 455 was controlled by KRS 446.110, which permits a newly enacted penalty to be applied retroactively if it is mitigating. However, in denying Appellant's motion, the trial court concluded that the old penalties, including a sentence of death, were not "clearly mitigated" by the new penalties.

This Court subsequently held to the contrary in *Commonwealth v. Phon,* Ky., 17 S.W.3d 106 (2000), wherein we specifically stated that life without parole was, in fact, a lesser penalty than death and could be lawfully imposed for a capital offense committed prior to the effective date of the statute "upon the unqualified consent of the defendant." *Id.* at 108.

On appeal, the Commonwealth argues that although the trial court's rationale was erroneous, Appellant was not entitled to receive the life without parole instruction because he failed to provide the necessary unqualified consent. It is the Commonwealth's position that "[g]iven the constitutional implications ... a request for the application of HB 455, and specifically the LWOP instruction, should be accompanied by a knowing, intelligent, and voluntary waiver by Appellant."

The language of KRS 446.110 provides, in part, "If any penalty, forfeiture or punishment is mitigated by any provision of the new law, such provision may, by the consent of the party affected, be applied to any judgment pronounced after the new law takes effect." And as previously stated, we held in *Phon, supra,* that KRS 446.110 authorizes retroactive application of life without parole, with a defendant's consent, since life without parole mitigates the death penalty. *Id.* at 107.

Appellant's motion requesting an instruction on life without parole stated:

Obviously, the defendant could assert his right to be free from ex post facto application of an arguably more punitive law. He chooses to waive that right. Ultimately, the new KRS 532.025 does not increase the potential maximum punishment, for it is still death. It merely adds another alternative among the non-death options presented to this jury.

In fact, defense counsel informed the trial court that Appellant was "willing to make a knowing, intelligent and voluntarily (sic) waiver of any right to attack this statute as a violation of the ex post facto prohibition of the U.S. and Kentucky Constitutions." Yet, the Commonwealth argues

that Appellant did not provide sufficient consent.

We fail to discern what more Appellant could have done to make his consent any more clear. The Commonwealth alluded during oral argument that Appellant himself, not trial counsel, had to express his unqualified consent. Such is a ludicrous proposition. Without question, Appellant's motion satisfied the "unqualified consent" requirement we established in *Phon, supra,* and he was entitled to receive an instruction on life without parole. As such, this case must be remanded for a new penalty phase.

## 2. *Duplicitous aggravating circumstances*

■ During the penalty phase, the trial court instructed the jury on three aggravating circumstances:

(a) The offense of Murder was committed while the Defendant was engaged in the commission of Robbery in the First Degree; OR (b) The offense of Murder was committed while the Defendant was engaged in the commission of Burglary in the First Degree; OR (c) The offense of Murder was committed for the purpose of receiving money, or any other thing of monetary value, or for other profit.

Appellant objected to the third aggravating circumstance on the basis that it was duplicative of the first two. Appellant argues that the improper cumulation of aggravating circumstances caused the jury to give undue weight to the mere number of aggravators and constitutes double jeopardy. We disagree.

■ Aggravating circumstances are not criminal offenses subject to double jeopardy considerations. Furthermore, the jury was only required to find that the murder was committed under one aggravating circumstance. The first two aggrava-

tors were clearly proper. Error, if any, in instructing on the third was harmless and did not prejudice Appellant. RCr 9.24.

## 3. *Mitigating Circumstances*

■ Appellant was not entitled to a complicity or accomplice instruction as mitigation. KRS 532.025(2)(b)(5) provides, "[t]he defendant was an accomplice in a capital offense committed by another person and his participation in the capital offense was relatively minor." In denying Appellant's request for such mitigating instruction, the trial court stated:

[F]or record purposes, there's no evidence at this time, and, in fact, in the guilt or innocence phase there was no instruction tendered relating to the involvement of another person, that would give rise to the jury's conclusion, in this phase, there being no additional proof, that there was someone else involved in this matter.

■ While the "quantum of evidence necessary to sustain a penalty phase instruction is clearly less" than the evidence required for a guilt phase instruction on the circumstances which underlie the mitigator, *Hunter, supra,* a trial court is not required to give an instruct on a mitigating circumstance unless it is supported by the evidence. *Smith v. Commonwealth,* Ky., 845 S.W.2d 534 (1993). Other than defense counsel's comments during opening statements, there was no evidence presented that could lead a jury to believe another individual was involved in the charged crimes. Notwithstanding, the instructions did include the catchall provision which allowed the jury to consider "any mitigating circumstances otherwise authorized by law." KRS 532.025(2).

## V. MISCELLANEOUS ISSUES

## 1. *Defense Counsel's Admissions of Guilt*

■ Appellant argues that the trial court erred by failing to inquire whether

52

Appellant knowingly and voluntarily consented to defense counsel's admissions of guilt during opening and closing arguments. Specifically, counsel told the jury during opening statements that Appellant was a "thief and burglar," and that although he went to Williamson's residence on the day in question to steal from her, Appellant was not the person who murdered Williamson. Again, during closing arguments, defense counsel stated that Appellant had committed the other crimes, even the theft of Betty Geiman's wallet, but he was not a murderer. Appellant, relying on *Wiley v. Sowders*, 647 F.2d 642 (6th Cir.1981), *cert. denied*, 454 U.S. 1091, 102 S.Ct. 656, 70 L.Ed.2d 630 (1981), now argues that the trial court should have conducted a *sua sponte* inquiry as to whether Appellant consented to such a trial strategy.

In *Wiley*, the Sixth Circuit Court of Appeals granted a petitioner's request for a writ of habeas corpus on the grounds that petitioner's counsel had admitted petitioner's guilt as a trial tactic, but had not gained petitioner's knowing consent prior to the admission. The Court held:

> [A]n attorney may not admit his client's guilt which is contrary to his client's earlier entered plea of 'not guilty' unless the defendant unequivocally understands the consequences of the admission. Counsel may believe it tactically wise to stipulate to a particular element of a charge or to issues of proof. However, an attorney may not stipulate to facts which amount to the 'functional equivalent' of a guilty plea.

*Id.* at 649. (citations omitted). The Court concluded that the client's knowing consent to such trial strategy must appear on the record, outside the presence of the jury, in a manner consistent with *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).

However, in a subsequent companion case, *Wiley v. Sowders*, 669 F.2d 386, 389 (6th Cir.1982), the Court clarified its prior holding, stating "an on-the-record inquiry by the trial court to determine whether a criminal defendant has consented to an admission of guilt during closing arguments represents the preferred practice. But we did not hold in *Wiley*, and do not now hold, that due process requires such a practice." Thus, contrary to Appellant's argument, the trial court did not err in failing to conduct a *sua sponte* inquiry as to Appellant's consent to his counsel's strategy.

More importantly, while Appellant couches this issue in terms of the trial court's duty, this is essentially an ineffective assistance of counsel claim. This court has held as a general rule that claims of ineffective assistance are not properly raised on direct appeal, but rather must proceed by way of a post-trial motion under RCr 11.42 to allow the trial court the opportunity to review the issues. *Humphrey v. Commonwealth*, Ky., 962 S.W.2d 870, 872 (1998). In fact, the Sixth Circuit recognized that both *Wiley* cases presented ineffective assistance of counsel claims. However, the Court determined that although the claims had not been preserved in the trial court, they were fairly presented to this Court, and as such, Petitioners had exhausted their state remedies. *Wiley*, 669 F.2d at 388.

2. *Severance of Theft Charge*

■ The trial court did not err in refusing to sever the charge of theft by unlawful taking over $300. In denying Appellant's motion, the trial court noted that "such evidence tends to establish identity, motive, and part of a plan for criminal action. The passage of time between the offenses charged does not determine or compel severance. The character

of the offenses of May 19 and June 25 are interwoven one with the other . . . ."

RCr 6.18 provides that two or more offenses may be charged in the same indictment if they are of the same or similar character, or are based on the same acts or transactions connected together or constituting parts of a common scheme or plan. The two incidents were intertwined in that Appellant first became a suspect in the June 25th crimes after Gail Williamson told police that some jewelry had been stolen on May 19th when Appellant was at the Williamson residence cleaning carpets. Furthermore, evidence of the earlier theft showed that Appellant did not randomly pick Williamson when he committed the June 25th crimes, rather he had gained knowledge about the Williamson residence and its contents through his employment with Kiwi Carpet Cleaning.

A trial court has broad discretion in determining whether to grant a motion for severance and reversal is not warranted absent an abuse of that discretion. *Davis v. Commonwealth* Ky., 899 S.W.2d 487 (1995). Certainly, the evidence of the May 19th theft was prejudicial to Appellant. However, the evidence was also relevant, probative and within the requirements of RCr 6.18. No error occurred.

### 3. *Cumulative Error*

Appellant received a fundamentally fair trial and we find that the isolated instances of harmless error are insufficient to create a cumulative effect which would warrant reversal of his convictions for a new trial. *Tamme, supra; compare Funk, supra.*

For the foregoing reasons, Appellant's convictions are affirmed. This case is remanded to the Kenton Circuit Court for a new penalty phase wherein Appellant will be eligible for an instruction on life without parole.

All concur to affirm the convictions.

KELLER, J., concurs, in part, and dissents, in part, by separate opinion in which STUMBO, J., joins and JOHNSTONE, J., joins, in part as to Limitations on Voir Dire Examination.

WINTERSHEIMER, J., concurs, in part, and dissents, in part, by separate opinion.

KELLER, Justice, Concurring in Part and Dissenting in Part.

Although I agree with the majority opinion's conclusion that the trial court's failure to instruct the jury as to the sentencing option of life imprisonment without the benefit of probation or parole (LWOP) requires us to reverse Appellant's sentence of death and remand Appellant's Murder conviction to the trial court for a new capital sentencing phase, I write separately because I disagree with the majority's resolution of certain other issues. Specifically, I disagree with Part II(1) of the majority opinion because I believe that the trial court's limitations on Appellant's voir dire examination created a substantial risk that Appellant's death sentence may have been reached by jurors who were unable to consider the full range of penalties and/or unable to consider Appellant's alleged intoxication as a mitigating circumstance. Accordingly, I do not believe that the trial court permitted a constitutionally adequate voir dire examination. And, I dissent from the majority opinion to the extent that, in addition to the relief granted in the majority opinion, I would direct the trial court upon remand to allow Appellant to investigate prospective jurors' abilities to consider the full penalty range and the specific mitigating circumstances that Appellant intends to present. In addition, I disagree with the majority's Part III(3) analysis of the issues concerning

Appellant's oral statements—or lack thereof—to the investigating officers. Rather than dismissing Appellant's allegations of error out-of-hand with the questionable conclusion that Appellant's allegation of error raises no cognizable constitutional inquiry because "he did not remain silent, but rather denied any knowledge of the crimes,"[1] I would hold that these unpreserved allegations of error are not reviewable by this Court at this time because the record suggests that Appellant's failure to object to the introduction of this evidence may have been trial strategy.

## LIMITATIONS ON VOIR DIRE EXAMINATION

In *Lockett v. Ohio*,[2] the United States Supreme Court recognized that the death penalty is "qualitatively different" from a

sentence of imprisonment[3] and held that individualized consideration of the circumstances of a capital crime and the character of the defendant who committed that crime were critical to prevent its arbitrary application.[4] Although the Sixth Amendment to the United States Constitution does not require that a jury make the ultimate determination whether to impose the death penalty,[5] the United States Supreme Court has held that, when juries are asked to deliberate capital punishment, Fourteenth Amendment due process protections require that those juries be comprised of fair and impartial jurors.[6] Two of the most important facets of such impartiality are a knowing and informed ability to consider the full range of punishments[7] and the ability to consider all relevant mitigation evidence.[8]

1. Majority Opinion at 95 S.W.3d 34, 47 (2002).

2. 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

3. *Id.* 438 U.S. at 604, 98 S.Ct. at 2964, 57 L.Ed.2d at 989.

4. *Id.* 438 U.S. at 605, 98 S.Ct. at 2965, 57 L.Ed.2d at 990.

5. *See Proffitt v. Florida*, 428 U.S. 242, 252, 96 S.Ct. 2960, 2966, 49 L.Ed.2d 913, 923 (1976) (plurality opinion) ("It has never [been] suggested that jury sentencing is constitutionally required."). *But see Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (holding that Sixth Amendment requires jury finding as to aggravating circumstance necessary for imposition of the death penalty).

6. *Morgan v. Illinois*, 504 U.S. 719, 726–7, 112 S.Ct. 2222, 2228–2229, 119 L.Ed.2d 492, 501–2 (1992).

7. *See Witherspoon v. Illinois*, 391 U.S. 510, 522 n. 21, 88 S.Ct. 1770, 1777 n. 21, 20 L.Ed.2d 776, 785 n. 21 (1968) ("The most that can be demanded of a venire[person] in this regard is that he [or she] be willing to *consider* all of the penalties provided by state

law[.]"); *Grooms v. Commonwealth*, Ky., 756 S.W.2d 131, 138 (1988) ("In a capital case ... it is especially important that the jury not be comprised of people unwilling to consider the entire range of punishment in the event of a guilty verdict.").

8. *Penry v. Lynaugh*, 492 U.S. 302, 328, 109 S.Ct. 2934, 2951–2, 106 L.Ed.2d 256, 284 (1989) ("In order to ensure 'reliability in the determination that death is the appropriate punishment in a specific case,' the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime." (citations omitted)). *See also Eddings v. Oklahoma*, 455 U.S. 104, 113–15, 102 S.Ct. 869, 876–77, 71 L.Ed.2d 1, 10–11 (1982):

Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence.... The sentencer ... may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration.

*Id.* 455 U.S. at 115 n. 10, 71 L.Ed.2nd at 11 n. 10 ("[T]he Oklahoma death penalty statute permits the defendant to present evidence 'as

In *Rosales–Lopez v. United States*,[9] the United States Supreme Court observed that a full and adequate voir dire "plays a critical function in assuring the criminal defendant that his ... right to an impartial jury will be honored."[10] This Court has reached the same conclusion.[11] However, "[d]espite its importance, the adequacy of voir dire is not easily subject to appellate review."[12] Nonetheless, the United States Supreme Court has conceptualized its review of voir dire adequacy as a situational inquiry and has articulated a standard under which appellate courts should evaluate an examination's sufficiency:

> Questions ... might be helpful in ascertaining whether a juror is impartial. To be constitutionally compelled, however, it is not enough that such questions be helpful. Rather the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair.[13]

The Supreme Court has applied this standard in a number of cases in which trial courts limited the subject matter of voir dire examination and, by way of example, has concluded that voir dire regarding the subject of racial prejudice is required in capital cases when requested by the defense,[14] but is required in non-capital cases only when "racial issues were 'inextricably bound up with the conduct of the trial,' " '[15] and that there is no constitutional right to question prospective jurors regarding their opinions about a defendant's facial hair[16] or to permit specific inquiry into the content of pretrial publicity to which potential jurors were exposed.[17]

The Supreme Court has also cautioned, however, that a voir dire examination which addressed all relevant subject matter might still fail to pass constitutional muster if the trial court relies on vague, "can you follow the law?" questions which leave jurors' actual preconceptions unprobed.[18] The Court has emphasized that

---

to any mitigating circumstances.' *Lockett* requires the sentencer to listen."); *Morgan v. Illinois, supra* note 6 at 504 U.S. at 739, 112 S.Ct. at 2235, 119 L.Ed.2d at 509 ("Any juror to whom mitigating factors are likewise irrelevant should be disqualified for cause, for that juror has formed an opinion concerning the merits of the case without basis in the evidence developed at trial."); *Skipper v. South Carolina*, 476 U.S. 1, 4, 106 S.Ct. 1669, 1671, 90 L.Ed.2d 1, 6 (1986) ("Equally clear is the corollary rule that the sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.' ").

9. 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981).

10. *Id.* 451 U.S. at 188, 101 S.Ct. at 1634, 68 L.Ed.2d at 28.

11. *See Thomas v. Commonwealth*, Ky., 864 S.W.2d 252, 259 (1993).

12. *Rosales–Lopez v. United States, supra* note 9 at 451 U.S. at 188, 101 S.Ct. at 1634, 68 L.Ed.2d at 28.

13. *Mu'Min v. Virginia*, 500 U.S. 415, 425–6, 111 S.Ct. 1899, 1905, 114 L.Ed.2d 493, 506 (1991). *See also Turner v. Murray*, 476 U.S. 28, 33, 106 S.Ct. 1683, 1687, 90 L.Ed.2d 27, 34–5 (1986) (describing the "broad inquiry" in an allegation of inadequate voir dire as "whether under all of the circumstances presented there was a constitutionally significant likelihood that, absent [this] questioning ... the jurors would not be indifferent.").

14. *See Turner v. Murray, supra* note 13.

15. *Rosales–Lopez v. United States, supra* note 9. *See also Ristaino v. Ross*, 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976); *Ham v. South Carolina*, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973).

16. *Ham v. South Carolina, supra* note 15.

17. *Mu'Min v. Virginia, supra* note 13.

18. *Morgan v. Illinois, supra* note 6 at 504 U.S. at 735–6, 112 S.Ct. at 2232–2233, 119 L.Ed.2d at 506–7 ("It may be that a juror could, in good conscience, swear to uphold

some degree of deference to trial courts is necessary because "determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the matter of catechism."[19] At the same time, however, courts must remain sensitive to the fact that dissonance can exist between the questioner and prospective jurors because of asymmetrical understandings of legal language and concepts.[20]

In the case at bar, Appellant wished to examine potential jurors to see if they could consider the full range of penalties—including the statutory minimum penalty of twenty (20) years. The trial court, however, would not allow Appellant to ask prospective jurors if they could consider the minimum penalty and instead framed the inquiry regarding the "low end" of the penalty range as whether a jury could consider "a term of imprisonment of not less than twenty years." Of course, an affirmative answer to this question only meant that the juror could consider sen-

tencing Appellant to imprisonment for *some* term of years—perhaps fifty (50), or a hundred (100) or even a thousand (1000) years—not that the juror could consider the statutory minimum sentence. This Court has consistently held that a defendant "is entitled to a jury that can fairly consider the *entire range* of punishments for his crimes."[21] And, in *Grooms v. Commonwealth*,[22] we held that "a juror should be excused for cause if he would be unable in any case ... to consider the imposition of the minimum penalty prescribed by law."[23] Recently, in *Lawson v. Commonwealth*,[24] we examined how voir dire regarding the available penalty range should be conducted in non-capital cases and concluded, based on our estimation of the "significant opportunity costs [of] over-generalizing the inquiry"[25] that, "the questioner should define the penalty range in terms of the possible minimum and maximum sentences[.]"[26] I can envision no

the law and yet be unaware that maintaining such dogmatic beliefs ... would prevent him or her from doing so. A defendant on trial for his life must be permitted on voir dire to ascertain whether his prospective jurors function under such misconception.").

**19.** *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841, 852 (1985). *See also Morgan v. Illinois, supra* note 6 at 504 U.S. at 729, 112 S.Ct. at 2230, 119 L.Ed.2d at 503 ("The Constitution, after all, does not dictate a catechism for voir dire .... ").

**20.** *See Witherspoon v. Illinois, supra* note 7 at 391 U.S. at 510 n. 9, 88 S.Ct. at 1773, 20 L.Ed.2d at 781 n. 9 ("The critical question, of course, is not how the phrases employed in this area have been construed by courts and commentators. What matters is how they might be understood—or misunderstood—by prospective jurors."); *Wainwright v. Witt, supra* note 19 at 469 U.S. at 424–5, 105 S.Ct. at 852, 83 L.Ed.2d at 852 ("[M]any venire[persons] ... may not know how they will react when faced with imposing the death sentence,

or may be unable to articulate ... their true feelings.").

**21.** *Woodall v. Commonwealth*, Ky., 63 S.W.3d 104, 117 (2002) (emphasis added). *See also Lawson v. Commonwealth*, Ky., 53 S.W.3d 534, 541 (2001) ("We remain convinced that, in all criminal cases, the right to a fair and impartial jury requires the jury to possess the ability to consider the *full range* of penalties[.]" (emphasis added)); *Shields v. Commonwealth*, Ky., 812 S.W.2d 152, 153 (1991) ("In order to sit as a juror in a criminal case, a member of the venire must be able to consider *any permissible* punishment." (emphasis added)).

**22.** *Supra* note 7.

**23.** *Id.* at 137.

**24.** *Supra* note 21.

**25.** *Id.* at 543.

**26.** *Id.* at 544. *See, e.g., Stopher v. Commonwealth*, Ky., 57 S.W.3d 787, 808–812 (2001) (Keller, J., dissenting) (quoting portions of individual voir dire in which trial court al-

reason for a different rule regarding voir dire examination as to the minimum penalty in capital cases where the stakes are far greater. Because the voir dire examination permitted in this case did not allow the trial court or the parties to assess whether the jurors could consider the statutory minimum punishment of twenty (20) years, Appellant was "denied the right to meaningful voir dire on the issue of punishment."[27]

With respect to Appellant's allegation that the trial court unconstitutionally limited the scope of his voir dire examination by prohibiting him from inquiring whether prospective jurors could consider the fact that Appellant was under the influence of drugs and alcohol as a mitigating circumstance,[28] I acknowledge that, in *Woodall v. Commonwealth*,[29] this Court held that "it was not an abuse of discretion by the trial judge to restrict the voir dire ... concerning specific mitigation evidence."[30] However, I did not agree with that holding then,[31] and I do not agree with the citation-free, conclusory declaration in today's majority opinion that "the trial court properly curtailed questions that were not proper and only confused the panel."[32] Although Appellant persuasively argues that evidence of intoxication is a "double-edged sword" that some jurors will interpret as heightening rather than reducing a defendant's culpability, the trial court would not allow Appellant to seek out those jurors with more specific questioning, and instead merely allowed examination as to whether jurors could consider

undefined "mitigating circumstances." As each juror's answer to this question would vary according to his or her own conception of what possible "mitigating circumstances" may exist, I have little confidence that this question reached the heart of the relevant inquiry—whether the jurors could consider a mitigating circumstance specifically authorized by the General Assembly and that Appellant presented *in this case.* While the basis for the holding in *Woodall* was that the examination as to the specific mitigating circumstance was designed "to oblige jurors to commit themselves by either accepting a specific mitigator or rejecting it before any evidence was heard,"[33] here, Appellant's proposed question sought only to determine if prospective jurors could consider intoxication as a mitigating circumstance. As Appellant thus sought no more than the United States Constitution guarantees him—fair and impartial jurors who could consider his relevant mitigation evidence[34]—I believe the trial court denied Appellant a constitutionally adequate voir dire examination by prohibiting such questioning.

Although I believe the erroneous limitation of Appellant's voir dire would require reversal of Appellant's death sentence even if the trial court had not otherwise committed reversible error during the capital sentencing phase, the court's failure to instruct the jury as to LWOP renders the voir dire error largely moot. Upon remand, however, I would direct the trial court not only to properly instruct the jury

lowed defense counsel to examine juror regarding his ability to consider the minimum penalty).

27. *Anderson v. Commonwealth,* Ky., 864 S.W.2d 909, 911 (1993).

28. *See* KRS 532.025(2)(b)(7).

29. *Supra* note 21.

30. *Id.* at 116.

31. *Id.* at 135 (Stumbo, J., dissenting).

32. Majority Opinion, *supra* at 44.

33. *Woodall v. Commonwealth, supra* note 21 at 116.

34. *See supra* note 8 and surrounding text.

as to all available sentencing options, but also to permit Appellant to conduct a constitutionally adequate voir dire.

## APPELLANT'S STATEMENTS AND SILENCE

In my opinion, the majority's conclusion that it need not "engage in a lengthy constitutional analysis of whether Appellant was or was not in custody or whether his *Miranda* rights were, in fact, violated [because] [a]t no point did Appellant state that he did not wish to talk to the officers or that he desired questioning to cease until he could speak with an attorney" [35] is inadequate to address Appellant's allegations of error concerning his abbreviated statements to the investigating officers. Although the majority opinion's analysis implicitly assumes that a clear and unequivocal invocation of the right to remain silent is a necessary precondition to each of Appellant's distinct arguments for relief, this analysis completely overlooks—or is at least unresponsive to: (1) Appellant's

allegation that his admission to stealing jewelry from the victim's home on a prior occasion occurred during a custodial interrogation in which he did not receive *Miranda* warnings; and (2) a split of authority that currently exists at the United States Circuit Court level as to whether a state violates a defendant's Fifth Amendment privilege against self-incrimination when—as was the case here [36]—the state, at trial, utilizes a defendant's silence, including refusals to discuss a matter prior to arrest, as substantive evidence of the defendant's guilt.[37]

I nonetheless concur in the majority's conclusion that Appellant's allegations of error in this regard do not justify our reversal of Appellant's conviction. I note that, in the trial court, Appellant objected to none of the evidence that he now targets on appeal, and, because "it may reasonably be inferred that appellant intentionally failed to object for reasons of trial strategy," [38] these unpreserved allegations

---

**35.** Majority Opinion, *supra* at 47.

**36.** Specifically, the Commonwealth introduced evidence that: (1) Appellant "made no comment whatsoever" at the time he was handcuffed; (2) during both the second and third times that Appellant was interviewed by Detective Denham and Officer Embry, Appellant denied any knowledge of the murder and stated that he had "nothing else to say"; and (3) that, although the investigating officers gave Appellant "the opportunity to describe what happened," Appellant never acknowledged the fact that he had been at the victim's residence and never made mention of a second individual (a defense initially employed by Appellant at trial) during the interview. During its culpability phase closing argument, the Commonwealth specifically commented on Appellant's tight lips in a manner that affirmatively disparaged Appellant's constitutional right not to incriminate himself:

> [Appellant] is attempting at every turn, by virtue of how he acts, to minimize his risks. If you recall during the course of the interview that he gave to the police, his standard was "I don't know what you're talking

about" or "I ain't got nothing to say." In all honesty, ladies and gentlemen, what he was saying was this, "I'm not going to say anything that I killed her because I'm going to make you prove it. I'm going to make you go out and prove that I did it because I, in light of the fact that I did the act of killing, in order to reduce the risk of my high risk crime of burglary and robbery, I'm not going to cop out to it now." And he, in essence, dared the police to go out and prove him wrong.

**37.** *See Combs v. Coyle*, 205 F.3d 269, 282–283 (6th Cir.2000) (collecting cases). The Sixth Circuit holds that "the use of a defendant's prearrest silence as substantive evidence of guilt violates the Fifth Amendment's privilege against self-incrimination." *Id.* at 283.

**38.** *Ice v. Commonwealth*, Ky., 667 S.W.2d 671, 674 (1984). *See also Cosby v. Commonwealth*, Ky., 776 S.W.2d 367, 369 (1989) ("*Ice* specifies only that '*prejudicial error*' must be reviewed regardless of contemporaneous objection, and we hasten to reaffirm that this

of "error" are, thus, inappropriate subjects for our review on direct appeal.[39] Fact patterns akin to the one presented here—where the Commonwealth seeks to present statements obtained from a defendant during what is arguably a custodial interrogation, and there is an issue of whether the defendant was informed of his *Miranda* rights prior to the questioning—would usually alert a criminal defense attorney that a suppression issue might exist. However, based upon indications from the record in this case—including: (1) Appellant's defense counsel's opening statement, in which she emphasized that, despite extensive questioning by professionals trained in interrogation, Appellant did not confess to the murder; (2) Appellant's defense counsel's cross-examination of Detective Denham that resulted in the repetition of Appellant's brief protestations of his innocence; and (3) defense's closing argument that emphasized that Appellant told the investigating officers "that he didn't kill her, Mrs. Williamson" and rationalized Appellant's failure to further confide in the officers as possibly the result of Appellant's distrust or Appellant's belief that the officers would not help him—I believe it is a more-than-reasonable assumption that the failure to object constituted reasonable trial strategy. After all, the small amount of inculpatory information that Appellant gave during the interviews was consistent with the overall defense strategy of admitting to the property crime offenses, but focusing the defense upon the relative dearth of evidence as to the death eligible offense. By allowing the Commonwealth to introduce evidence that Appellant had denied any involvement in the murder, the defense was able to "have its cake and eat it too" by enjoying the benefit of a "no adverse inference" instruction while simultaneously placing Appellant's words before the jury without subjecting Appellant to cross-examination and impeachment with his prior felony convictions. I also observe that pleadings associated with a motion in limine filed by the Commonwealth that sought to prohibit the defense from introducing evidence that Appellant told family members and friends after he was arrested that he had robbed, but not killed, the victim suggest that the defense team had investigated other bases of making the jury aware of Appellant's out-of-court denials of his involvement in the victim's death, but concluded that the hearsay rule stood in the way.

While it is possible that the failure to object was the result of an oversight by counsel rather than trial strategy—and, in fact, the ultimate resolution of that issue may require an evidentiary hearing in a future proceeding—we need not resolve that issue conclusively one way or another at this stage. For the purposes of this Court's review of Appellant's unpreserved allegation of error in a capital case, the first "prong"[40] of our inquiry is whether "there is a *reasonable* justification or explanation for defense counsel's failure to object, e.g., whether the failure *might have been* a legitimate trial tactic."[41] I believe from the record in this case that Appel-

---

means errors where there is no reasonable justification or explanation for defense counsel's failure to object, tactical or otherwise . . . .").

**39.** *See Sanders v. Commonwealth*, Ky., 801 S.W.2d 665, 668–9 n. 1 (1991) ("Generally, once a judgment has become final, such issues constitute a collateral attack on the judgment imposing sentence, and must be pre-

sented to the trial court pursuant to RCr 11.42.").

**40.** *See Perdue v. Commonwealth*, Ky., 916 S.W.2d 148, 154 (1996).

**41.** *Sanders v. Commonwealth*, *supra* note 39 at 668 (emphasis added).

lant's trial counsel may very well have concluded that evidence of Appellant's terse declaration of his innocence would "do more good than harm." For that reason, I would not address the merits of Appellant's allegations of error concerning the interview statements.

STUMBO, J., joins. JOHNSTONE, J., joins in part as to Limitations on Voir Dire Examination.

WINTERSHEIMER, Justice, Concurring in Part and Dissenting in Part.

I concur with so much of the opinion as affirms the conviction. However, I must respectfully dissent from that part of the opinion that remands this case to circuit court for a new penalty phase. The circuit judge was correct in denying the motion for an instruction on a sentence of life without the benefit of probation or parole. The conclusion by the trial judge that the old penalties, including a sentence of death, were not clearly mitigated by the new penalty provisions was proper. The directions of *Commonwealth v. Phon,* Ky., 17 S.W.3d 106 (2000), should not be applied automatically. The trial judge is the key factor in the giving of jury instructions.

> If any penalty, forfeiture or punishment is mitigated by any provision of the new law, such provision *may,* by the consent of the party affected, be applied to any judgment pronounced after the new law takes effect.

I would affirm the conviction and sentence in all respects.